873 F.2d 655
 57 USLW 2636
 Joseph P. FITCHIK, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee,
v.
NON DESTRUCTIVE TESTING CORP., Third-Party Defendants.
Linda A. DEGIROLAMO, Appellant,
v.
NEW JERSEY TRANSIT AUTHORITY d/b/a New Jersey Transit, Appellee.
Felix E. GUZMAN, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Sidney KINNEAR, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Kenneth G. BANTA, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee,
v.
Everette G. WHITENOUR, Christopher Middleton, Justine Smith,
and Town of Dover, Third Party Defendants.
William ROCKWELL, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC.
Robert K. HEATON, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
William P. McKENNA, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Craig A. CONLON, Appellant,
v.
NEW JERSEY RAIL OPERATIONS, INC., Appellee.
Laurence O'HALLORAN, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Dennis MARTIN, Appellant,
v.
NEW JERSEY TRANSIT CORPORATION & New Jersey Transit Rail
Operations, Inc., Appellees.
Robert G. STOCKER, Sr., Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Clifford E. WILLIAMSON, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
David J. CHWASZCZEWSKI, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Philip ROXAS, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Patrick J. MUELLER, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Joseph L. DUFFY, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Edward J. FLILLER, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
James C. HARDEN, Jr., Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Lynn R. STIGLIANO Personal Representative of the Estate of
John Paul Stigliano, Deceased, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Louis D. ELLIS, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
Ashraf GHOBRIAL, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
William C. HAZELSON, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC., Appellee.
George FEATHERMAN, Appellant,
v.
NEW JERSEY TRANSIT RAIL OPERATIONS, INC. Appellee.
 Nos. 88-5142, 88-5270, 88-5320 to 88-5325, 88-5327 to
88-5329, 88-5336 to 88-5338, 88-5371, 88-5373,
88-5374, 88-5376 to 88-5378, 88-5383,
88-5559, 88-5682, 88-5961.
 United States Court of Appeals,
Third Circuit.
 Argued July 19, 1988.
Reargued In Banc Jan. 30, 1989.
Decided April 17, 1989.
 
 Joseph A. Coffey, Jr., Lawrence A. Katz (argued), Mitchell A. Kaye, Coffey & Kaye, Bala Cynwyd, Pa., for appellants.
 W. Cary Edwards, Atty. Gen. of New Jersey, Michael R. Clancy, Grace A. Dennigan, Emerald L. Erickson (argued), Deputy Attys. Gen., for appellee.
 Argued July 19, 1988.
 Before HIGGINBOTHAM, BECKER and ROSENN, Circuit Judges.
 Reargued In Banc Jan. 30, 1989.
 Before GIBBONS, Chief Judge, SEITZ, HIGGINBOTHAM, SLOVITER, BECKER, STAPLETON, MANSMANN, GREENBERG, HUTCHINSON, SCIRICA, COWEN, NYGAARD and ROSENN, Circuit Judges.OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 These consolidated appeals require us to resolve the question whether the eleventh amendment precludes the plaintiff-appellants, railroad workers who sustained personal injuries in the course of their employment, from instituting compensatory damage actions in federal court under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. Secs. 51-60 (1982), against the defendant-appellee New Jersey Transit Rail Operations, Inc. ("NJTRO"). This opinion will address the case of the lead plaintiff, Joseph P. Fitchik, a NJTRO conductor who was seriously injured when his train struck a track guard. Thereafter, Fitchik sued NJTRO in the district court for the District of New Jersey. The district court granted NJTRO's motion to dismiss Fitchik's complaint on the ground that NJTRO was immune from suit under the eleventh amendment, and Fitchik appeals. We consider Fitchik's arguments as representative of those asserted by each of the plaintiffs whose appeals have been consolidated.
 
 
 2
 Although the eleventh amendment issue is presented here in a number of aspects, the first, dispositive, question is whether NJTRO, which is a wholly owned subsidiary of New Jersey Transit Corporation ("NJT"), is the alter ego of New Jersey. A state agency is entitled to immunity from suit in a federal court under the eleventh amendment when a judgment against it "would have had essentially the same practical consequences as a judgment against the State itself." Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979). If NJTRO is not an arm of the state, eleventh amendment immunity will not attach. For the reasons that follow, we conclude that NJTRO is not the alter ego of New Jersey. We therefore reverse.
 
 I. ELEVENTH AMENDMENT BACKGROUND
 
 3
 Fitchik's contention that NJTRO is not the alter ego of New Jersey relies principally upon our decisions in Urbano v. Board of Managers, 415 F.2d 247 (3d Cir.1969), cert. denied, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970), and Kovats v. Rutgers, the State University, 822 F.2d 1303 (3d Cir.1987). The district court dismissed Fitchik's complaint on the grounds that NJTRO was the alter ego of the state; that in enacting the FELA and the Federal Safety Appliance Act, Congress did not manifest the unmistakable statutory language necessary to abrogate the states' immunity from suit in federal court; and that New Jersey had not waived its immunity. See 678 F.Supp. 465, 468-69 (1988) (citing Welch v. State Department of Highways and Public Transportation, 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987)). Our review of defendant's entitlement to eleventh amendment immunity (including the threshold alter ego question) is plenary. Skehan v. State System of Higher Education, 815 F.2d 244, 246 (3d Cir.1987).[1]
 
 The eleventh amendment provides:
 
 4
 The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 5
 Despite the amendment's language, the Supreme Court has consistently interpreted it to immunize an unconsenting state " 'from suits brought in federal courts by her own citizens as well as by citizens of another state.' " Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 100, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984) (quoting Employees v. Missouri Department of Public Health and Welfare, 411 U.S. 279, 280, 93 S.Ct. 1614, 1615, 36 L.Ed.2d 251 (1973)). A suit may be barred by the eleventh amendment even though a state is not named a party to the action, as long as the state is the real party in interest. Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974). The Court has therefore attempted on several occasions to determine just when a suit against an entity is actually a suit against the state itself.
 
 
 6
 In Pennhurst, for example, the Court asserted that the state is the real party in interest when " 'the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration,' or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act.' " 465 U.S. at 101 n. 11, 104 S.Ct. at 908 n. 11 (citation omitted). This court has formulated a more specific and comprehensive test to determine whether eleventh amendment immunity extends to an entity:
 
 
 7
 '[L]ocal law and decisions defining the status and nature of the agency involved in its relation to the sovereign are factors to be considered, but only one of a number that are of significance. Among the other factors, no one of which is conclusive, perhaps the most important is whether, in the event plaintiff prevails, the payment of the judgment will have to be made out of the state treasury; significant here also is whether the agency has the funds or the power to satisfy the judgment. Other relevant factors are whether the agency is performing a governmental or proprietary function; whether it has been separately incorporated; the degree of autonomy over its operations; whether it has the power to sue and be sued and to enter into contracts; whether its property is immune from state taxation, and whether the sovereign has immunized itself from responsibility for the agency's operations.
 
 
 8
 Urbano, 415 F.2d at 251-52.
 
 
 9
 Several of the Urbano factors are interrelated. For clarity's sake, we divide the nine Urbano factors into three larger questions as follows:
 
 
 10
 (1) Whether the money that would pay the judgment would come from the state (this includes three of the Urbano factors--whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);
 
 
 11
 (2) The status of the agency under state law (this includes four factors--how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and
 
 
 12
 (3) What degree of autonomy the agency has.[2]
 
 
 13
 We turn to our evaluation of these factors. Our record consists of an extensive set of stipulated facts. As will be seen infra, these factors are not weighed evenly in striking the balance.
 
 II. DISCUSSION
 
 14
 A. Funding.
 
 
 15
 Although no single Urbano factor is dispositive, the most important is whether any judgment would be paid from the state treasury. Urbano itself calls this "the most significant factor," 415 F.2d at 251, and this conclusion is supported by the Supreme Court's identification of the amendment's central goal as the prevention of federal court judgments that must be paid out of the state's treasury. See generally, Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). For example, federal litigants cannot get damages from the state treasury by suing a state officer in his or her official capacity, see Edelman, 415 U.S. at 663-66, 94 S.Ct. at 1355-57, although suits against officers for injunctive relief, which affect the state's discretion to pursue its own policies, are permitted. See Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).
 
 
 16
 We focus here on the funds of NJTRO's parent. Since NJTRO is a wholly owned subsidiary of NJT, any eleventh amendment immunity conferred upon NJTRO would be derivative of that possessed by NJT. See Kovats, 822 F.2d at 1306. The following are the relevant financials. During the year ending June 30, 1987,
 
 
 17
 1) passenger fares accounted for approximately $289 million of $313 million in operating revenues (New Jersey Transit 1987 Annual Report (hereinafter "Annual Report");
 
 
 18
 2) NJT received approximately $49 million in federal and $167 million in state operating subsidies (id.);
 
 
 19
 3) federal sources had provided approximately $944 million of a total of $1.3 billion of the balance of contributed capital, whereas $392 million was obtained from a combination of state and local sources.
 
 
 20
 Additionally, NJT is self-insured, has set aside funding to meet its liabilities for injury and damage claims, and has the authority to purchase liability insurance (Id.). Moreover, NJT issued grant anticipation notes in 1985 and 1986, and after June 30, 1987, it entered in to a line of credit arrangement which permits it to borrow funds. (Id.)
 
 
 21
 NJTRO points to the following facts to support its contention that NJT's money is in fact the state's money and thus that any judgment against NJT constitutes a judgment against the state: (1) New Jersey gives a significant amount of money to NJT; and (2) NJT is entitled to invest its money in the state Cash Management Fund ("CMF") and monies in the CMF are "public monies." NJTRO also argues that New Jersey has dominion over NJT's money, because the Governor of New Jersey has veto power over NJT's operation and thus can influence NJT's revenue raising efforts. We do not see this fact as indicating state ownership of the money already in NJT's accounts. We think it, instead, to be relevant to the third factor we discuss, NJT's autonomy, and, consequently, we discuss it below. See infra at ---- - ----.
 
 
 22
 The most striking financial detail is that NJT's money does not come predominantly from the state. New Jersey provides less than 33% of NJT's operating funds. See Annual Report at 30. But even putting that significant fact aside, we note that the fact that an entity derives some of its income from the state does not mean that it is entitled to partake of the state's immunity. "[T]he nature of the state's obligation to contribute may be more important than the size of the contribution." Blake v. Kline, 612 F.2d 718, 723 (3d Cir.1979), cert. denied, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980). What is significant is whether the money that pays the fine will come from the state treasury rather than the agency's funds, or (alternatively) whether the state must reimburse the agency and thus effectively pay the debt.
 
 
 23
 Strong support for Fitchik's position that NJT is not the alter ego of the state is found in Kovats, 822 F.2d 1303, 1309, in which we held that a judgment against Rutgers is not a judgment against the state. In considering the funding issue, we observed that Rutgers had four distinct sources of income: auxiliary income from dining hall and room rental fees; restricted income from governmental and private groups; general university income from tuition, fees and investments; and state appropriations. Id. at 1308. Rutgers' use of the first two revenue sources was restricted to the service or program that engendered the income. The remaining sources, which comprised approximately 72% of the university's total income, were commingled in a general operating account used to fund daily operations. State appropriations constituted between 50 and 70% of the general operating account. Id. Importantly, the state was under no obligation to pay Rutgers' debts or to reimburse it for any judgments.
 
 
 24
 The facts here are just as strong as Kovats for the proposition that NJT is not the alter ego of the state. Like the situation in Kovats, New Jersey is under no obligation to pay NJT's debts or reimburse NJT for judgments that it pays. Indeed, New Jersey has specifically disclaimed any liability for NJT's debts. See N.J.Stat.Ann. Sec. 27:25-17 (West Supp.1988). Thus, "[a]ny increase in [NJT's] state appropriation as a result of a judgment against [NJT] will be entirely the result of discretionary action by the state." Kovats, 822 F.2d at 1309. Although New Jersey might appropriate funds to NJT to meet any shortfall caused by judgments against NJT, such voluntary payments by a state do not trigger sovereign immunity. See id.; Blake, 612 F.2d at 726 (holding that "an ancillary effect on the state treasury will not create an eleventh amendment jurisdictional bar").
 
 
 25
 Furthermore, it is not clear that NJT would need to request funds from the state coffers in order to meet shortfalls caused by adverse judgments. NJT gets most of its money from fares. See Annual Report at 30. Just like a private railroad, NJT can raise revenues by raising fares, thus spreading the costs of accidents among its users. See N.J.Stat.Ann. Sec. 27:25-5(n). Alternatively, NJT could cover any shortfall by reducing its expenses or capital budget. In this regard, we also note that NJT gets a far higher percentage of its income from non-state sources than Rutgers.
 
 
 26
 Moreover, judgments against NJT will not necessarily lead to shortfalls. NJT is authorized to purchase liability insurance. N.J.Stat.Ann. Sec. 27:25-5(r). It is self-insured for up to three million dollars per occurrence for rail operations, subject to additional participation for larger losses. See Annual Report at 34. Thus NJT can meet at least some of the claims against it with the money it has set aside to cover such liabilities, and to that considerable extent need not ask the state or anyone else for help.
 
 
 27
 Nor are we persuaded by the fact that NJT, unlike Rutgers, is entitled to invest its funds in the CMF, or the fact that funds contained in the CMF are, by definition, "public moneys." N.J.Stat.Ann. Sec. 52:18A-90.4. That a statute terms property "public" does not mean that it constitutes the state's property for purposes of the eleventh amendment. "[C]ounties, municipalities and school districts" are allowed to deposit moneys in the CMF, id., but it is crystal clear that these entities are not entitled to immunity from suit in federal court. See Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 280-81, 97 S.Ct. 568, 572-73, 50 L.Ed.2d 471 (1977).[3] The designation of the money as "public" simply does not answer the question of who has dominion over the money in NJT's accounts.
 
 
 28
 As evidence of state dominion over NJT's money, NJTRO points to the state's control of monies invested in the CMF. See Appellee's Supp.Br. at 10. We find this evidence inadequate for three reasons. First, NJT is not obliged to invest in the CMF. Because the state only gets control of the investments with NJT's consent, control in the first instance remains with NJT. See N.J.Stat.Ann. Sec. 27:25-5(p). Second, control is only significant to the funding factor if it indicates ownership.[4] Since New Jersey does not have a financial interest that would be directly and adversely affected by the fund's diminution, the funds in the CMF do not belong to New Jersey, notwithstanding the fact that New Jersey makes investment decisions about the money in the CMF. Third, the control that New Jersey exercises over NJT's money is identical to the control it has over the county, city, and school district funds in the CMF. Yet, as noted above, it is clear that those entities are subject to suit in federal court.[5]
 
 
 29
 Therefore, with respect to the funding issue, we find this case to be controlled by Kovats. Both Rutgers and NJT were created by statute to serve a public purpose, and both receive significant funding from the state. But in neither case has New Jersey obligated itself to pay the entity's debts. Thus judgments against both Rutgers and NJT would be paid out of their own funds, rather than the public fisc. Furthermore, both Rutgers and NJT can turn to sources besides state appropriations to meet shortfalls, and NJT also has insurance to help offset its losses. Finally, neither the fact that NJT may invest its funds in the CMF, nor the fact that it does not segregate the funds it gets from state appropriations, provides a meaningful distinction between NJT and Rutgers. Just as it did in Kovats, the funding factor here weighs strongly against NJT's claim that it is entitled to immunity from suit in federal court.
 
 
 30
 B. Status Under State Law.
 
 
 31
 The second basic Urbano question is whether state law treats an agency as independent, or as a surrogate for the state. NJT's capacity to sue and its immunities from state taxation are best considered as part of this inquiry because they help provide a complete picture of New Jersey's treatment of NJT. New Jersey law on the area is checkered; some factors counsel toward according NJT sovereign immunity, while others counsel against. Because NJT's status under New Jersey law is uncertain, the analysis of this factor does not significantly help in determining whether NJT is entitled to immunity from suit in federal court. Cf. Kovats, 822 F.2d at 1310 (finding Rutgers' status under New Jersey law to be too indeterminate to aid in the sovereign immunity inquiry).
 
 
 32
 There is some indication that New Jersey law considers NJT to be an arm of the state. NJT was created by the New Jersey Public Transportation Act of 1979 ("the Act") as the successor to the Commuter Operating Agency of the New Jersey Department of Transportation. N.J.Stat.Ann. Sec. 27:25-24. (West Supp.1988). NJT's operating property, plant and equipment were acquired by the state of New Jersey and subsequently transferred to the corporation at cost. New Jersey law declares that NJT was created to serve a "public purpose." N.J.Stat.Ann. Sec. 27:25-2. But see n. 2, supra.
 
 
 33
 More importantly, NJT is subject to the New Jersey Tort Claims Act, Transport of New Jersey v. Matos, 202 N.J.Super. 571, 573, 495 A.2d 503, 505 (N.J.Super.Ct.Law Div.1985); is immune from state property tax, N.J.Stat.Ann. Sec. 27:25-16; has the power of eminent domain, id. at Sec. 27:25-13(a) and (c); and is subject to the strictures of the state administrative procedure act, id. at Sec. 27:25-5(e). Further, the New Jersey Supreme Court has declared NJT to be a "public" entity, although not in the context of sovereign immunity. See Ross v. Transport of New Jersey, 114 N.J. 132, 553 A.2d 12, 13 (Sup.Ct.1989) (NJT bus operations not required to carry uninsured motorist coverage).
 
 
 34
 We must be wary of taking these arguments too far, however. For example, the New Jersey Tort Claims Act, applies to New Jersey municipalities and counties as well, see N.J.Stat.Ann. 59:1-3 (West Supp.1988), and those entities are not accorded sovereign immunity. See supra n. 3 at ----. Indeed, Rutgers was similarly subject to the New Jersey Tort Claims Act, and immune from state property tax. See Kovats, 822 F.2d at 1311. And the fact that NJT has the power of eminent domain, and thus exercises "a slice of state power" does not mean that it is necessarily entitled to eleventh amendment immunity. See Lake Country Estates, 440 U.S. at 401, 99 S.Ct. at 1177. Significantly, New Jersey counties and municipalities also have the power of eminent domain, see N.J.Stat.Ann. Secs. 40:66A-31.4a, 20:3-47, 40:56-7, 40:56-8 (1967 & Supp.1988), as do privately owned public utilities of every kind. See id. Sec. 48:3-17.6.
 
 
 35
 On the other side of the equation, New Jersey has given power to NJT in two spheres that Urbano identified as indicative that an agency is not entitled to sovereign immunity. New Jersey has accorded NJT a separate corporate existence, N.J.Stat.Ann. Sec. 27:25-4(a), and has given NJT the ability to sue and be sued in its own right. Id. at Sec. 27:25-5(a). New Jersey law allows NJT to enter into contracts on its own behalf, id. at Secs. 27:25-5(r) and (v), and purchase land, stock, equipment, and personal property. Id. at Secs. 27:25-13, 27:25-5(u), 27:25-10, and 27:25-5(j). And the New Jersey Supreme Court has held that the University of Medicine and Dentistry of New Jersey, a state university created by statutes similar to the ones that created NJT, is not entitled to eleventh amendment immunity. See Fuchilla v. Layman, 109 N.J. 319, 537 A.2d 652 (1988). This evinces some reluctance on the part of the New Jersey courts to accord immunity to agencies whose status under New Jersey statutes is ambiguous.
 
 
 36
 On balance, the "status under state law" factors seem to tilt in favor of NJTRO's contention that NJTRO is entitled to sovereign immunity, but only slightly.
 
 
 37
 C. Autonomy.
 
 
 38
 Turning to the final Urbano consideration, the degree of NJT's autonomy from the state, we conclude that, in terms of autonomy, NJT lies somewhere between Rutgers and the Port Authority of New York and New Jersey--an agency which this Court declared to be entitled to eleventh amendment immunity. See Port Authority Police Benevolent Association v. Port Authority of New York and New Jersey, 819 F.2d 413 (3d Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987).
 
 
 39
 In favor of its autonomy, NJT is governed by its own board of directors and is "independent of any supervision or control by the department [of transportation] or by any body or officer thereof." N.J.Stat.Ann. Sec. 27:25-4(a) and (b). Moreover, the board has significant powers. Among other things, it can cause the corporation to enter contracts, bring lawsuits, purchase and sell property, buy insurance, structure the corporation's internal management, and set and collect fares. See N.J.Stat.Ann. 27:25-5. Furthermore, only the board can initiate action by NJT. The Governor and other members of New Jersey's executive branch have no such authority.
 
 
 40
 On the other hand, three out of seven of the board members are required to be members of the executive branch, and the Governor has veto power over the board's actions. N.J.Stat.Ann. Sec. 27:25-4. As NJTRO correctly points out, these facts make the case distinguishable from Kovats. But this case is also distinguishable from cases in which agencies were found to be alter egos of the state. In Port Authority, for example, in addition to being subject to gubernatorial veto, the agency could not embark on new projects without the authorization of both the New York and New Jersey legislatures. 819 F.2d at 417.
 
 
 41
 NJT falls between the cracks of the prior cases. Although not "highly autonomous" like Rutgers, NJT is significantly autonomous. Since the degree of control by the governor is fairly substantial, we think that this factor counsels slightly in favor of according immunity to NJT.
 
 
 42
 D. Striking the Balance.
 
 
 43
 Since 1890, the eleventh amendment has been construed to entitle states to immunity from suit in federal court. Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). The amendment is intended to provide a partial solution to "the problems of federalism inherent in making one sovereign appear against its will in the courts of the other." Employees of the Department of Public Health and Welfare v. Missouri, 411 U.S. 279, 294, 93 S.Ct. 1614, 1622, 36 L.Ed.2d 251 (1973) (Marshall, J., concurring). The amendment's general purpose is to foster the states' autonomy. See Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 101 n. 11, 104 S.Ct. 900, 908 n. 11, 79 L.Ed.2d 67 (1984). This Court has attempted to effectuate the amendment's purpose by application of the factors listed in Urbano. In this case, the most important Urbano factor--whether the judgment would be paid by state funds--provides extremely strong indication that NJT is not the alter ego of New Jersey. The other factors--NJT's treatment under state law, and its degree of autonomy--provide only weak support for the conclusion that NJT is New Jersey's alter ego.
 
 
 44
 On balance, therefore, we conclude that NJT is not the alter ego of New Jersey, and thus that its subsidiary, NJTRO, is not entitled to eleventh amendment immunity.[6] The judgment of the district court will therefore be reversed and the consolidated cases will be remanded for pretrial proceedings and trial.
 
 
 45
 ROSENN, Circuit Judge, dissenting.
 
 
 46
 The majority holds that NJTRO is so independent of the state as to not merit its eleventh amendment immunity. The majority reaches this result by relying, in essence, only on its analysis of one of the Urbano factors, the impact of a judgment against NJTRO on the treasury of the State of New Jersey. This court, however, has stated that funding alone does not resolve the immunity issue. Whether payment is from the state treasury or from an independent entity, although important, is not dispositive. We so held in Port Authority Police Benevolent Association v. Port Authority of New York and New Jersey, 819 F.2d 413 (3d Cir.1987). Payment is only meaningful in light of the entity's other attributes. Blake v. Kline, 612 F.2d 718, 724 (3d Cir.), cert. denied, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980). "If the state structures an entity in such a way that the other relevant criteria indicate it to be an arm of the state, then immunity may be retained even where damage awards are funded by the state at the state's discretion." Kovats v. Rutgers, the State University, 822 F.2d 1303, 1310 (3d Cir.1987) (footnote omitted).
 
 
 47
 Although NJTRO is unquestionably something of a hybrid, I believe that overall the factors developed in Urbano v. Board of Managers, 415 F.2d 247 (3d Cir.1969), cert. denied, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970), relative to this eleventh amendment inquiry weigh in favor of holding NJTRO to be the alter ego of the state. I therefore respectfully dissent.
 
 
 48
 Before commencing with my analysis, I observe that NJTRO is a wholly owned subsidiary of New Jersey Transit Corporation (NJT). Therefore, any eleventh amendment immunity conferred upon NJTRO would be derivative of that possessed by NJT. See Kovats, 822 F.2d at 1306.I. FUNDING
 
 
 49
 The majority combines three of the Urbano factors relating to finance under the general heading of "funding": whether payment will come from the state treasury; whether the entity has the power to satisfy the judgment; and whether the sovereign has immunized itself from responsibility for the entity's debts. Although I take no exception to that analytic approach, I cannot agree that in the end the funding factor is determinative of the alter ego status.
 
 
 50
 As a preliminary matter, I quite agree with the majority that "the nature of the state's obligation to contribute may be more important than the size of the contribution." Maj. op. at 660 (quoting Blake v. Kline, 612 F.2d 718, 723 (3d Cir.1979), cert. denied, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112 (1980)). In fiscal year 1987 New Jersey contributed $167 million to NJT, representing about thirty-three percent of NJT's operating funds. Although this may indeed be a "significant fact," maj. op. at 660, what is even more significant is the extent of the state's commitment to NJT. For, as illustrated by our holding in Port Authority, 819 F.2d at 416-18, even an entity that has become entirely independent of the state financially may nevertheless share in the state's sovereign immunity if its statutory structure and history demonstrate state involvement with and obligation to the entity.
 
 
 51
 The majority makes three arguments in support of its conclusion that the funding factor weighs against NJT's alter ego status. First, it argues, because New Jersey has statutorily insulated itself from liability for NJT's debts, any increase in state appropriations to NJT to cover judgments against it would be wholly discretionary on the state's part. Maj. op. at 661. Second, NJT does not lack the power to pay judgments against it because it can raise fares, cut its expenses or capital budget, or rely on liability insurance. Maj. op. at 661. Finally, simply because NJT is permitted to invest its money in the state's Cash Management Fund (CMF) does not mean that all of NJT's funds actually belong to the state. Maj. op. at 661-62. The majority concludes that the funding factor "weighs strongly" against NJT's claim of alter ego status. Maj. op. at 663.
 
 
 52
 I address the majority's arguments in the reverse order. I agree that NJT's authority to invest in the CMF is of little significance. As the majority points out, the option to invest in the CMF, if relied on, would prove too much considering that other entities that place their funds in the CMF, such as counties, municipalities, and school districts, clearly do not enjoy eleventh amendment immunity. See maj. op. at 662.
 
 
 53
 With respect to NJT's ability to pay judgments against it, I think the majority's reasoning a bit facile. The majority states that it is "not clear" that NJT would have to turn to the state to make up any shortfalls occasioned by judgments against it. It suggests that NJT could simply raise fares or reduce its expenses or capital budget to make up the deficit. The fiscal realities and operating experiences of urban mass transit systems in the United States, including NJTRO, would seem to negate such an easy answer. At some point, increases in fares or reductions in the quality or availability of service have the tendency of reducing ridership, and the reduction in ridership in turn diminishes revenue.[1] Given the history of NJT's recurring budgetary crises, and the continuing and escalating annual appropriation by the state of many millions of dollars to NJT's operating budget,[2] it is highly unlikely that NJT could make up significant shortfalls by the simple means suggested by the majority.
 
 
 54
 Nor could NJT satisfy judgments by incurring debt. Under NJT's enabling statute (the New Jersey Public Transportation Act of 1979 or "the Act"), NJT is explicitly prohibited from incurring a deficit. N.J.Stat.Ann. Sec. 27:25-17 (West Supp.1988). Moreover, the grant anticipation notes (GANs) mentioned by the majority, see maj. op. at 660, do not constitute a revenue raising resource. The Act permitting their use explicitly asserts that GANs are not bonds but rather a transitory tool for dealing specifically with short term cash flows arising out of delays in receiving federal subsidies. In like manner, the credit arrangements after June 30, 1987, referred to by the majority, are also limited to borrowing against section 9 grant proceeds under the federal Urban Mass Transportation Act "for future working capital." See N.J.Stat.Ann. Sec. 27:25-5 (West Supp.1988). In light of these statutory restrictions and the real economic constraints under which NJT operates, it is hard to see where NJT could turn for money other than to the state.
 
 
 55
 Lastly, the majority relies on the statutory provision specifically disclaiming the state's liability for NJT's debts. Because of this provision, the majority argues, any increase in the state's appropriation to NJT would be discretionary, and the state is therefore "under no obligation" to reimburse NJT for judgments that it pays. Maj.op. at 661. The majority therefore finds this case indistinguishable from Kovats in which we held that Rutgers was not the alter ego of the state. 822 F.2d at 1312.
 
 
 56
 Granted that the state has insulated itself from liability for NJT's debts and that this is a factor to be considered among the three funding-related Urbano criteria. In light of the economic realities facing NJT and the statutory language creating that corporation, however, I cannot agree with the majority that this protective device releases New Jersey from its obligation to financially support NJT.
 
 
 57
 NJT is by far the greatest provider of mass transit in New Jersey. The state created NJT in 1979 to take over the largest bus carrier in New Jersey, Transport of New Jersey, and to assume the state's commuter rail operations from Conrail. It is common knowledge that the economic vitality of this densely populated and strategic northeast corridor state is heavily dependent upon the availability of mass transportation. In creating NJT, New Jersey recognized the catastrophic effects to the economy and its citizens by a collapsed mass transit and therefore committed huge funds when it undertook to structure a state controlled mass transit system.
 
 
 58
 One need not look only to economic realities and the historical concept of NJT to see the depth of New Jersey's commitment to it. New Jersey by statute asserted that "[a]s a matter of public policy, it is the responsibility of the State to establish and provide for the operation and improvement of a coherent public transportation system in the most efficient and effective manner." N.J.Stat.Ann. Sec. 27:25-2 (West Supp.1988) (emphasis added). This succinct language mandates the state's ongoing obligation to NJT. Implicit is the state's obligation to provide available financial resources for the purpose of providing transportation, so long as the corporation continues to be a public entity.
 
 
 59
 Furthermore, it is prudent and good common sense in undertaking large, indefinite, and unknown risks for an enterprise to assume corporate status and limit personal liability for creditor's claims. The insulation from liability to third parties, however, does not demonstrate a lack of financial or governmental commitment to the business or its objectives. The state, in the exercise of reasonable business judgment, may have insulated itself from creditors' claims, as do shareholders in most corporations, but it did not thereby renounce its obligation to sustain NJT. Mass transportation is at once essential to the state and in large part available only through the state-created corporation. In light of these circumstances, and the state's consistent record of having deficit-financed NJT since its inception, I cannot agree that New Jersey is not a real party in interest, without financial obligation to maintain the operational integrity of NJT.[3]II. AUTONOMY
 
 
 60
 The majority assesses whether NJT enjoys autonomy from the state. Reviewing both the powers granted NJT and the constraints placed on it by the Act, the majority concludes that NJT "lies somewhere between Rutgers and Port Authority of New York and New Jersey," an agency held to be an arm of the state. See Port Authority, 819 F.2d at 418; Maj. op. at 663. The majority decides that the autonomy factor only "slightly" favors according immunity. I, on the other hand, believe that the heavy governmental control is the most compelling reason for according immunity to NJT.
 
 
 61
 In support of NJT's independent status, the majority notes that the agency is governed by a board of directors, which can cause NJT to enter contracts, bring lawsuits, buy and sell property, buy insurance, structure the corporation's internal management and set and collect fares. In these respects, the Port Authority, held an arm of the state, is not significantly different. The Port Authority is run by a board of commissioners, N.J.Stat.Ann. Sec. 32:1-5 (West 1963), which has the power to appoint officers and hire employees as it sees fit for the performance of its duties. Id. at Sec. 32:1-15. The Authority has the power to buy, build, or lease any terminal within its district. Id. at Sec. 32:1-7. It may set charges for the use of its terminals or facilities. Id. It may own real and personal property, id., and borrow money and secure the debt by bonds or mortgages on its property. Id.
 
 
 62
 The majority notes, however, that the Port Authority in other respects is less autonomous than NJT. I agree. For example, the Port Authority is forbidden by statute from undertaking new projects without legislative authorization. Port Authority, however, does not represent the threshold level of state control that must be exercised for an entity to be an alter ego of the state. Without attempting to exactly locate that level, I believe that NJT, like the Port Authority, exceeds it.
 
 
 63
 NJT's seven member board of directors consists of four public members who are appointed by the state governor and confirmed by the senate, N.J.Stat.Ann. Sec. 27:25-4(b) (West Supp.1988), and three members who sit on the board by virtue of their positions within the state government. These include the commissioner of transportation, the state treasurer, and another member of the executive branch appointed by the governor. Id. Thus, the appointment of the four public members is controlled by the state and the remaining members of the board are high ranking appointments of the executive branch of the state government. The governor is empowered to remove any public board member for cause. Id. Although the Act declares that NJT "is independent of any supervision or control" by the department of transportation, id. at Sec. 27:25-4(a), it requires the commissioner of transportation to chair the board. Id. at Sec. 27:25-4(d). All board meetings are subject to the New Jersey Open Public Meetings Act. Id. at Sec. 27:25-4(g). Importantly, all proposed board action is subject to gubernatorial veto and the minutes of every board meeting must be delivered to the governor. Id. at Sec. 27:25-4(f). Thus, the state retains vital policy, organic, and operational control over NJT through its power to appoint NJT's board members and through the governor's veto power and consequent control of the entity's pursestrings.
 
 
 64
 Furthermore, NJT must submit annual operational and financial reports for the preceding fiscal year to the governor and to the transportation and communications committees of both houses of the legislature. Id. at Sec. 27:25-20(b). The Act authorizes the state auditor to examine the corporation's accounts, id. at Sec. 27:25-20(e), and makes its records and papers open to public inspection. Id. at Sec. 27:25-20(d). Finally, the commissioner of transportation annually receives a report containing the corporation's operational, capital, and financial reports or plans for the previous, current, and ensuing fiscal years. Id. at Sec. 27:25-20(a).
 
 
 65
 NJT is required to consult with state authorities in developing its employee compensation schedule. Id. at Sec. 27:25-15. On its completion, the schedule must be filed with the state along with a list of all of NJT's full and part time officers and employees. Id. The corporation is additionally subject to New Jersey's competitive bidding statutes. Id. at Sec. 27:25-11. Significantly, rules and regulations must be adopted and published in accordance with the Administrative Procedure Act. Id. at Sec. 27:25-5(e).
 
 
 66
 The control that the state has over NJT's board and over NJT operations bears no similarity to the state's relationship to its counties, cities, or school districts or their funds. An examination of the enabling statute reveals pervasive state control over NJT. The corporation's very limited autonomy effectively attenuates the significance that the majority gives to the funding factor.
 
 
 67
 The majority relies heavily on Kovats, 822 F.2d 1303 (3d Cir. 1987), for its position that NJT is not the alter ego of the state. The majority believes that as in Kovats the facts here are just as strong for the proposition that NJT is not the alter ego of the state. Maj. op. at 661. I disagree.
 
 
 68
 There may be similarities in legislative satisfaction of the shortfalls in the two entities, Rutgers University and NJT, but the majority wholly ignores vast differences in origin, public purpose, and state control between the two organizations. The majority disregards these differences, rigidly compartmentalizes the funding factor, and actually regards this as the decisive factor despite its references to other Urbano considerations.
 
 
 69
 Rutgers University had its origin in Queens College as a private educational institution chartered by King George III of Great Britain in 1776, with a requirement that the president be a member of the Dutch Reformed Church. In 1825, after some previous minor amendments in its charter, it changed its name to the Trustees of Rutgers College in New Jersey. In 1920, by board resolution the college formally excised from its charter all religious and sectarian qualifications and the specific requirement that the president be a member of the Reformed Church. Over the years, Rutgers expanded, became in part a land grant school under federal legislation, and by 1956 consisted of twenty-one colleges and divisions at graduate and undergraduate levels. In 1956 the university was reorganized by the state legislature and its charter substantially amended under an act known as "Rutgers, the State University Act of 1956."[4]
 
 
 70
 In 1956 the state undertook a more active financial role in the university, and the school became an "instrumentality of the state" for the purpose of providing public higher education. N.J.Stat.Ann. Sec. 18A:65-2 (West 1968). The University's purpose, like that of so many other educational institutions in New Jersey, essentially is to provide access to higher learning. Although it serves a highly important function in the educational life of New Jersey, Rutgers is neither unique nor indispensable. There are other institutions of higher learning in New Jersey and elsewhere, perhaps not as convenient or as inexpensive, which also provide higher education.
 
 
 71
 On the other hand, NJT was in the first instance conceived and fathered by the state to provide an indispensable service in its economic, commercial, and social life. It offers a vast network of mass railroad and bus transportation throughout the state. Created as the successor to the Commuter Operating Agency of the New Jersey Department of Transportation, NJT received from the state at cost the transit system's operating property, plant, and equipment. See reply brief app. at 73. Section 27:25-4(a) of the Act asserts that NJT was created within New Jersey's executive branch as "a body corporate and politic" and proclaims that "the corporation is hereby constituted as an instrumentality of the State exercising public and essential governmental functions...."
 
 
 72
 Although the Act of 1956 declares that Rutgers is an "instrumentality of the state for the purpose of operating the state university," N.J.Stat.Ann. Sec. 18A:65-2 (West 1968), it does not assert, as compared with the 1979 Act creating NJT, that the university is exercising "essential governmental functions." N.J.Stat.Ann. Sec. 27:25-4(a) (West Supp.1988) (emphasis added). Moreover, and perhaps more significant, the state of New Jersey does not have the operational, fiscal, and appointive controls over Rutgers that it has over NJT. Based upon the differences in historical origin, purposes, and state control, I believe that Kovats is not determinative of NJT's alter ego status.
 
 III. STATUS UNDER STATE LAW
 
 73
 Under the heading "status under state law," the majority gathers the following Urbano factors: how local law and decisions treat the agency; whether the agency is separately incorporated; whether it may sue or be sued; and whether it is immune from taxation. Examination of the various factors leads the majority to conclude that, although overall the factors tilt "slightly" in favor of alter ego status, maj. op. at 663, NJT's status under state law does not significantly help in the eleventh amendment analysis because it is "uncertain." Maj. op. at 662. I agree with the majority that the status under state law analysis tilts in favor of NJT's being the arm of the state, but I believe that the tilt is more than slight.
 
 
 74
 The treatment of NJT by New Jersey courts favors the agency's alter ego status. The majority notes that the New Jersey Supreme Court declared NJT to be a "public entity" in deciding a case concerning uninsured motorist coverage. See Ross v. Transport of New Jersey, 114 N.J. 132, 553 A.2d 12, 13 (Sup.Ct.1989); Maj. op. at 663. New Jersey courts addressed NJT's status in two earlier cases as well. Applying the alter ego analysis developed in federal courts for eleventh amendment purposes, the superior court in Travelers Insurance Co. v. Transport of New Jersey, 204 N.J.Super. 63, 497 A.2d 900 (1985), concluded that NJT was a public entity. A like decision was announced in Transport of New Jersey v. Matos, 202 N.J.Super. 571, 495 A.2d 503 (1985), which held NJT subject to the New Jersey Tort Claims Act.[5]
 
 
 75
 The majority would introduce ambiguity into this inquiry by seeing in the decision of Fuchilla v. Layman, 109 N.J. 319, 537 A.2d 652 (1988), a "reluctance on the part of New Jersey courts to accord immunity" to hybrid agencies. I find this ambiguity illusory. In Fuchilla the court considered the status of a state university. Whereas the majority sees a close analogy between the school and the mass transit operation, I do not. Not only do they differ in kind, but, for example, amendments to the enabling statute of the school at issue in Fuchilla explicitly declared it to be the "public policy of the State that the university shall be given a high degree of self-government." See Fuchilla, 537 A.2d at 657 (quoting N.J.Stat.Ann. Sec. 18A:64G-3.1). It is, in any event, quite unnecessary to resort to analogies when the New Jersey decisions treating NJT itself leave no room for speculation.
 
 
 76
 Admittedly, there are some characteristics relating to NJT's status under state law that suggest the entity's independence from the state. NJT has been granted the power to sue and be sued. N.J.Stat.Ann. Sec. 27:25-5(a) (West Supp. 1988). Other statutory provisions enable NJT to enter into contracts, id. at Sec. 27:25-5(r) and (v), buy land, id. at Sec. 27:25-13, and purchase stock, equipment, and personal property. Id. at Secs. 27:25-5(u), 27:25-10, and 27:25-5(j).
 
 
 77
 At the same time, there are other factors that place NJT within the realm of the state. Claims against the corporation are governed by the New Jersey Tort Claims Act, Transport of New Jersey v. Matos, 202 N.J.Super. at 573, 495 A.2d at 505, and by the New Jersey Contractual Liability Act. N.J.Stat.Ann. Sec. 27:25-19 (West Supp.1988). NJT is exempted by statute from all state taxation including, but not limited to, sales taxes, real property taxes, corporate franchise taxes, or income taxes. Id. at Sec. 27:25-16. NJT additionally is subject to the provisions of the state administrative procedure act, id. at Sec. 27:25-5(e), and has been given the power of eminent domain. Id. at Sec. 27:25-13(a)-(c).
 
 
 78
 The majority would diminish the significance of these last factors by pointing to entities that share those characteristics but are not alter egos of the state. See maj. op. at 664 ("We must be wary of taking these arguments too far, however."). We must also be wary, I believe, of taking comparisons on the basis of discrete factors too far. As the court observed in Kovats, " '[t]he decisions in other cases, while helpful in terms of analytic models, cannot govern our decision [here]....' " 822 F.2d at 1312 (quoting Soni v. Board of Trustees, 513 F.2d 347, 353 (6th Cir.1975), cert. denied, 426 U.S. 919, 96 S.Ct. 2623, 49 L.Ed.2d 372 (1976)). Each entity " 'exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances.' " Id. It is, after all, the balance of the factors that matters.
 
 
 79
 In sum, NJT has been granted many of the powers and privileges characteristic of a state, and specifically has been placed within the executive branch of the government. Of necessity, as a corporation transacting business in the commercial world, it enjoys many of the powers relative to operating a business. I believe, however, that overall the criteria decidedly favor alter ego status. Importantly, I think, the New Jersey courts applying the eleventh amendment alter ego analysis to NJT for other purposes have concluded that NJT is a public entity. Cf. Skehan v. Board of Trustees, 538 F.2d 53, 62 (3d Cir.1976) (in banc) (holding dispositive a state court decision finding state colleges such as Bloomsburg State College to be agencies of the state for sovereign immunity purposes). On the whole, therefore, the status of NJT under state law favors alter ego status in this case.
 
 
 80
 Based upon my belief that the essential criteria under Urbano and our prior decisions weigh in favor of NJT's alter ego status, I would hold that its wholly owned subsidiary, NJTRO, is entitled to eleventh amendment protection.
 
 IV. ELEVENTH AMENDMENT IMMUNITY
 
 81
 Because of the result I reach with respect to NJTRO's status as an arm of the state, I turn to the question not discussed by the majority but actually raised by the plaintiff in the trial court: whether the FELA contains the unequivocal statutory language necessary to abrogate the state's eleventh amendment immunity and subject NJTRO to suit in the federal court.
 
 
 82
 Eleventh amendment immunity may be avoided by congressional abrogation under the power granted by the enforcement provisions of section 5 of the fourteenth amendment, see Fitzpatrick v. Bitzer, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), or, as we have previously held, under the commerce clause of Article I. See United States v. Union Gas Co., 832 F.2d 1343, 1356 (3d Cir.1987), aff'd. sub nom. Pennsylvania v. Union Gas Co., 57 U.S.L.W. 4662 (1989). Furthermore, a state can waive its eleventh amendment immunity and consent to suit in federal court. Welch v. State Dep't of Highways and Public Transp., 483 U.S. 468, 473, 107 S.Ct. 2941, 2945, 97 L.Ed.2d 389 (1987). Fitchik argues that both exceptions apply.
 
 
 83
 Plaintiff argues that the FELA, considered in conjunction with the wealth of federal safety legislation applicable to state owned railroads, manifests Congress' unmistakable intention to abrogate the state's eleventh amendment immunity. Fitchik additionally contends that New Jersey waived its eleventh amendment immunity when it undertook to operate an interstate railroad while Parden was prevailing law. Both contentions require examination into the impact that the Supreme Court's recent decision in Welch has upon Parden.
 
 
 84
 In Welch, the petitioner, an employee of the Texas Department of Highways and Public Transportation, filed a personal injury suit against the respondent pursuant to the Jones Act. 483 U.S. at 471, 107 S.Ct. at 2944. Significantly, the Jones Act applied the remedial provisions of the FELA to seamen. Initially, the Court recognized that the eleventh amendment functions as an affirmative limitation on Article III's grant of judicial authority. Id. at ----, 107 S.Ct. at 2945. The Court, however, then considered the two exceptions that limit states' eleventh amendment protection. Discussing the waiver exception, the Court cautioned that because "constructive consent is not a doctrine commonly associated with the surrender of constitutional rights," a court will find "a waiver by the state only where stated by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." Id. (quoting Edelman, 415 U.S. at 673, 94 S.Ct. at 1360). Discussing the abrogation exception, the Court explained that Congress may abrogate the eleventh amendment without the states' consent when it expresses "its intention ... in unmistakable language in the statute itself." Id. (quoting Atascadero State Hosp. v. Scanlon, 473 U.S. 234, 243, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985)).
 
 
 85
 Applying the preceding analysis to the case before it, the Court held that the Jones Act's reference to "any seaman who shall suffer personal injury" did not constitute the unmistakable statutory language necessary for congressional abrogation of eleventh amendment immunity.[6] It reasoned that because the doctrine of sovereign immunity implies a constitutional distinction between the states and other employers of seamen, "a general authorization for suit in federal court is not the kind of unequivocal statutory language necessary to abrogate the eleventh amendment." Id. 483 U.S. at 476, 107 S.Ct. at 2947 (quoting Atascadero, 473 U.S. at 246, 105 S.Ct. at 3149).
 
 
 86
 The Court next considered the effect of its decision upon Parden, a case holding that Congress intended to abrogate the states' eleventh amendment immunity merely by making the FELA applicable to every common railroad carrier. See Parden v. Terminal Railway, 377 U.S. 184, 190, 84 S.Ct. 1207, 1211, 12 L.Ed.2d 233 (1964). The Court concluded that Parden was mistakenly decided insofar as it interpreted Congress' failure to explicitly exclude state railway workers from the scope of the FELA as a sufficient indication of its desire to subject the states to suit in federal court. Observed the Court: "Although our later decisions do not expressly overrule Parden, they leave no doubt that Parden 's discussion of congressional intent to negate Eleventh Amendment immunity is no longer good law." Welch, 483 U.S. at 478, 107 S.Ct. at 2948. Thus, the Court overruled Parden to the extent that it was inconsistent with the requirement that congressional abrogation of eleventh amendment immunity be expressed in unmistakably clear language.
 
 
 87
 In light of Welch, plaintiff's argument that the FELA manifests Congress' intention to abrogate the states' immunity is simply incomprehensible. Welch's rejection of Parden unequivocally stands for the proposition that the language of the FELA is insufficient to subject the states to suit in federal court. The Rail Safety and Service Improvement Act, 45 U.S.C. Sec. 431, federal legislation transferring the railroad to state control, and other federal legislation applicable to state owned railroads on which Fitchik relies similarly fail to manifest the unmistakable congressional intention necessary to abrogate the eleventh amendment.
 
 
 88
 Plaintiff further contends that New Jersey constructively waived its immunity when it chose to operate a railroad while Parden was the law of the land. Parden was premised at least in part upon the conclusion that the state had consented to suit in federal court. Fitchik argues that Welch does not reject entirely the notion of constructive consent; it merely holds that finding consent in Parden was inappropriate because the FELA did not provide a sufficiently clear statement that a state's operation of a railroad would work a waiver of eleventh amendment immunity. Plaintiff distinguishes this case by reasoning that the Supreme Court's decision in Parden, rather than the FELA itself, provided the clear statement that New Jersey would waive its immunity by assuming control of an interstate railroad.
 
 
 89
 Although this argument may have some initial appeal, it cannot withstand scrutiny. By 1982, when New Jersey undertook to operate the railroad, it was already questionable whether Parden was good law. Significantly, in Employees v. Missouri Department of Public Health & Welfare, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the Supreme Court refused to extend the reasoning of Parden to hold states subject to suit in federal court under the Fair Labor Standards Act, even though the FSLA and the FELA did not differ greatly in terms relevant to eleventh amendment immunity. See Employees, 411 U.S. at 299, 93 S.Ct. at 1625 (Brennan, J., dissenting); see also Edelman, 415 U.S. at 673-74, 94 S.Ct. at 1360-61 (rejecting argument that state waived eleventh amendment immunity by participating in federal program when legislation creating program lacked clear language that participation would signal constructive consent to suit in federal court). It is therefore arguable whether Parden provided a clear statement that New Jersey would waive its eleventh amendment immunity by operating the railroad. Consequently, it is uncertain whether New Jersey consented to federal jurisdiction when NJTRO began operations.
 
 
 90
 The ambiguity in decisional law at the time New Jersey began operation of the railroad is especially significant in light of the rule that a court will find waiver only where it is stated explicitly or is the only " 'reasonable construction' " See Welch, 483 U.S. at 473, 107 S.Ct. at 2945 (quoting Edelman, 415 U.S. at 673, 94 S.Ct. at 1360 (citation omitted)). Plaintiff has not established that New Jersey has waived its immunity by "express language." See id. Moreover, I am unwilling to draw the broad inference that New Jersey accepted the doubtful rule of Parden and waived its immunity to suit in federal court as a condition to operating the railroad. It is equally reasonable to assume that New Jersey chose to operate the railroad despite Parden, and was willing to challenge the decision in that case should the need arise. I would, therefore, decline to hold that New Jersey constructively consented to suit in federal court, and would hold that the eleventh amendment precludes plaintiff from maintaining a FELA action against NJTRO in federal court.[7]
 
 V. CONCLUSION
 
 91
 Facing the potential disaster that was threatened by a decaying public transportation system, the state of New Jersey in 1979 chose to enter the mass transit business. It did so not by creating yet another governmental subdepartment, but by the practical means of establishing a transportation corporation sheltered from the perennial delays, costs, and frustrations of a governmental structure. At the same time, however, the state retained control over corporate policies and the power to select the members of the board. Moreover, so long as the state maintains its statutory policy to provide mass public transportation and exercises its powers of control over NJT, the state remains implicitly obligated to sustain the financial vitality of the corporation it created. Thus, NJT is the alter ego of the state and New Jersey never stripped it of eleventh amendment immunity. As such, NJTRO is entitled to eleventh amendment immunity in an action against it in federal court.
 
 
 92
 For the foregoing reasons, the district court's order dismissing plaintiff's complaint for lack of subject matter jurisdiction should be affirmed.
 
 
 93
 Judges HIGGINBOTHAM, GREENBERG, HUTCHINSON, and NYGAARD join in this dissenting opinion.
 
 
 
 [1]
 Although Fitchik did not argue the alter ego issue in the district court, nor assert it as a ground for reversal in his opening brief to this court, we must nonetheless consider it for it implicates our jurisdiction (since the 11th amendment limits the reach of the federal courts). See Edelman v. Jordan, 415 U.S. 651, 677-78, 94 S.Ct. 1347, 1362-63, 39 L.Ed.2d 662 (1974). We must, of course, independently consider our jurisdiction. Cf. Bender v. Williamsport Area School District, 475 U.S. 534, 541, 106 S.Ct. 1326, 1331, 89 L.Ed.2d 501 (1986)
 
 
 [2]
 One of the Urbano factors--whether the agency exercises a governmental or proprietary function--is no longer a valid criterion in light of Garcia v. San Antonio Metro. Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). Garcia rejected the governmental-proprietary distinction as a basis for determining whether states must comply with federal legislation enacted pursuant to the commerce clause. Id. at 546-47, 105 S.Ct. at 1015-16. The Supreme Court held that the line drawing required by the distinction was unworkable, and that the inquiry rested upon a conception of the appropriate role of state government that is not grounded in the Constitution. Id. at 543-54, 105 S.Ct. at 1013-14. Concomitantly, we do not see how this factor could be germane to eleventh amendment analysis, hence we will not address it
 
 
 [3]
 Indeed, the Supreme Court has held since 1890 that counties and similar political subdivisions of the state are not entitled to eleventh amendment immunity, despite the fact that they exercise state power and receive significant amounts of money from the state. See Lincoln County v. Luning, 133 U.S. 529, 10 S.Ct. 363, 33 L.Ed. 766 (1890); see also Workman v. New York, 179 U.S. 552, 563-66, 21 S.Ct. 212, 216-17, 45 L.Ed. 314 (1900) (holding that cities are not entitled to eleventh amendment immunity); Mt. Healthy, 429 U.S. at 280-81, 97 S.Ct. at 572-73 (holding that school districts are not entitled to eleventh amendment immunity). Thus, from the time that it was construed as a grant of sovereign immunity, the eleventh amendment has only applied to bar suits that are actually or effectively against the state itself. As this opinion explains, that is not the case here
 
 
 [4]
 In Kovats this Court did describe the earlier case of Blake, 612 F.2d 718, as making the issue of immunity depend in part on the state's "control" over a fund from which a judgment might be paid. 822 F.2d at 1308-09. Significantly, however, what Kovats referred to as the "control" issue in Blake was the question whether money set aside in a separate account in the state treasury was actually the state's money--either because the state had an obligation to replace it, because there were insufficient funds in the account and the state would be obligated to pay any judgment directly, or because the state generally treated the funds as its own. 612 F.2d 723-24. Thus the issue in Blake was not whether the state had influence over the investment of some of the agency's money, but whether that money in fact belonged to the state
 
 
 [5]
 Nor does the fact that judgments against Rutgers could sometimes be satisfied from segregated accounts that contain no state funds, while NJT does not segregate its accounts, provide a reason to accord NJT sovereign immunity. The commingling of the funds does not affect New Jersey's obligation (or rather non-obligation) to replace the money that NJT spends. And it does not indicate any greater control by New Jersey of the money in the accounts. Furthermore, the bulk of the funds in the account were provided by non-state sources; payments from the fund up to the amount received from other sources (plus interest) can be considered as coming from monies that NJT obtained from the other sources, and thus do not fall under the rubric of state-provided funds. And, in any case, in light of the discussion above, see supra even if some of the money that pays the judgments came from state appropriations, that does not entitle NJT to sovereign immunity
 
 
 [6]
 Because we so conclude, we need not reach the issue of whether Congress has abrogated NJT's sovereign immunity, or whether New Jersey has waived it
 
 
 [1]
 New Jersey's supplemental appropriation in 1986 of five million dollars designed to reduce the amount of a proposed NJT fare increase demonstrates the legislature's belief in the impracticality and undesirability of raising passenger fares. P.L.1986 c. 48
 
 
 [2]
 According to the supplemental information supplied by NJT to this court, annual appropriations to NJT have increased steadily from $88 million in 1980-1981 to $194 million in 1988-1989. See NJT's supplemental submission at 5
 
 
 [3]
 Although this court has identified funding as the "most significant factor" in the alter ego balancing test, Urbano, 415 F.2d at 251, it has never decided what weight this factor should carry especially when it is suffused by other germane factors. That a judgment would be paid out of the state treasury thus may not be enough to cloak an entity with eleventh amendment immunity if other factors dictate to the contrary. Funding is therefore not always a controlling condition of alter ego status
 Moreover, this court has suggested that funding is not even a necessary condition of alter ego status. Although in Kovats the decision was against alter ego status, the court allowed for the possibility that an entity may be the alter ego of the state even though a judgment would not be paid out of the state treasury.
 Although no reported case has squarely presented such a situation, our understanding of the extent of eleventh amendment protection has always provided for the possibility that an entity may enjoy alter ego status even if payment of the judgment would not derive from the state treasury. Such a result would not be inconsistent with the Supreme Court's eleventh amendment jurisprudence that disallows federal jurisdiction over suits against states for damage awards but allows jurisdiction for suits seeking prospective injunctive relief. See Edelman v. Jordan, 415 U.S. 651, 667-68, 94 S.Ct. 1347, 1357-58, 39 L.Ed.2d 662 (1974); see also Green v. Mansour, 474 U.S. 64, 73-74, 106 S.Ct. 423, 428-29, 88 L.Ed.2d 371 (1985) (eleventh amendment bars even retroactive declaratory relief against state officials if not coupled with prospective relief). As Judge Sloviter explained in Kovats: "Those cases address the forms of relief available when it is clear that relief will run against a state; they do not address the preliminary issue of when relief is deemed to run against the state. As to the former issue, whether the primary relief sought is monetary and/or retroactive is conclusive; as to the latter, it is not." 822 F.2d at 1310 n. 7. Thus, there is no mandate against according alter ego status to an entity even though a judgment would not be paid from the state treasury.
 
 
 [4]
 For a more detailed history, see Trustees of Rutgers College v. Richman, 41 N.J.Super. 259, 125 A.2d 10 (1956)
 
 
 [5]
 NJT's alter ego status has also been the subject of a multitude of reported and unreported federal district court decisions. To our knowledge, every district court that has considered the question has held that NJT is the alter ego of New Jersey. See Dykman v. New Jersey Transit Rail Operations, Inc., 685 F.Supp. 79 (S.D.N.Y.1988); Johnson v. New Jersey Transit Rail Operations, Inc., Civ. No. 87-0173, slip op., 1988 WL 24148 (D.N.J. Mar. 15, 1988); Cianfrani v. New Jersey Transit Bus Operations, Inc., Civ. No. 87-3707, slip op., 1987 WL 15624 (E.D.Pa. Aug. 11, 1987); Worrell v. New Jersey Transit Bus Operations, Inc., Civ. No. 86-2075, slip op., 1987 WL 4400 (D.N.J. Jan. 29, 1987); Williamson v. New Jersey Transit Rail Operations, Inc., Civ. No. 86-5353, slip op., 1987 WL 5791 (S.D.N.Y. Jan. 9, 1987); Dunn v. New Jersey Transit Rail Operations, Inc., 681 F.Supp. 246 (D.N.J.1987); Brotherhood of Locomotive Engineers, 608 F.Supp. 1216 (S.D.N.Y.1985); Brotinsky v. New Jersey Transit Auth., Civ. No. 85-0314, slip op. (E.D.Pa. Mar. 20, 1985); Hightower v. New Jersey Transit Rail Operations, Inc., Civ. No. 84-1268, slip op. (D.N.J. Aug. 27, 1984); Saddle River Tours Ltd. v. New Jersey Dep't of Transp., Civ. No. 83-1776, slip op. (D.N.J. Oct. 31, 1983), aff'd, 745 F.2d 48 (3d Cir.1984); Gibson-Homans Co. v. New Jersey Transit Corp., 560 F.Supp. 110 (D.N.J.1982)
 
 
 [6]
 The Court observed that the question of whether Texas had waived its immunity was not before it
 
 
 [7]
 I would additionally reject Fitchik's assertions that the district court improperly characterized the issue before it as one of subject matter jurisdiction, and that denying state railroad employees access to federal court on FELA claims violates the equal protection clause