**Emblez LONGORIA, Plaintiff,**

v.

**State of NEW JERSEY; State of New Jersey–Division of State Police; John J. Farmer, Attorney General for the State of New Jersey; Carson J. Dunbar, Superintendent, State of New Jersey–Division of State Police; Peter G. Verniero; Carl A. Williams, Jr.; Captain Joseph Sarnecky; Lieutenant Joseph Wattai; John Does 1 through 10, Defendants.**

No. Civ.A. 99–543.

United States District Court, D. New Jersey.

Oct. 17, 2001.

---

Philip J. Moran, Skillman, NJ, Attorney for Plaintiff, Emblez Longoria.

Benjamin Clarke, Brian McLaughlin, Robert A. Tandy, DeCotiis, Fitzpatrick, Gluck, & Cole, LLP, Teaneck, NJ, Attorneys for Defendants, State of New Jersey, State of New Jersey–Division of State Police, John J. Farmer, Carson J. Dunbar, Peter G. Verniero, Carl A. Williams, Jr., Captain Joseph Sarnecky, and Lieutenant Joseph Wattai.

## OPINION

ORLOFSKY, District Judge.

## I. INTRODUCTION

This case presents a footnote to the ongoing public scrutiny of the operations and employment practices of the New Jersey State Police. Plaintiff, a long-time New Jersey State Trooper, alleges that his employment prospects have been dimmed by a long-standing aura of racial hostility in the ranks of the State Police, as well as by antagonism directed at him as a result of his personal ties to a previous, successful, critic of the institution. He now seeks money damages and injunctive relief. His claims, if true, reflect badly on the character of the New Jersey State Police; ultimately, however, they do not constitute wrongs cognizable in this Court. The Defendants have moved for summary judgment, pursuant to Fed.R.Civ.P. 56. The Plaintiff has filed a cross-motion for summary judgment. For the reasons set forth more fully below, I shall grant the Defendants's motion on Plaintiff's federal claims, and, in the exercise of my discretionary

power under 28 U.S.C. § 1367, dismiss the supplemental state law claims without prejudice. I shall also deny Plaintiff's cross-motion for summary judgment.

## II. FACTS AND PROCEDURAL HISTORY

■ The Plaintiff, Emblez Longoria ("Longoria"), an Hispanic male, has been a member of the New Jersey State Police since July 28, 1988. Def.'s R. 56.1 Statement ¶ 1.[1] During portions of 1997, Longoria was stationed at the State Police barracks in Hightstown, New Jersey. Longoria Depo. at 219.[2] While at Hightstown, Longoria was temporarily assigned to the Narcotics and Organized Crime Bureau ("NOCB"), another unit within the New Jersey State Police. *Id.* at 219–36. Longoria worked at the NOCB for approximately two months, *id.* at 246, garnering positive reviews. *Id.* at 238.

During Longoria's stay at the NOCB, the State Police posted a notice for a permanent position, essentially identical to the temporary position Longoria was then occupying. *Id.* at 236. Longoria applied for, but did not receive, that appointment. *Id.* at 237, 248. Instead, Longoria was given another temporary assignment with the NOCB. *Id.* at 247, 254–55. The assignment lasted "a few months." *Id.* at 262. Longoria was told his work during the second NOCB stint was "excellent." *Id.* at 270. Shortly thereafter, Longoria applied for a "very similar" permanent position in the Intelligence Unit, but was not hired.

---

**1.** Longoria has not filed a Statement of Undisputed Material Facts, as required by Local Civil Rule 56.1. Accordingly, I shall treat facts appearing in the Defendant's Rule 56.1 statement as admitted by Longoria, unless disputed by him in his briefs or contradicted by the evidence. *See Hill v. Algor,* 85

F.Supp.2d 391, 408 n. 26 (D.N.J.2000); *SEC v. Chester Holdings Ltd.,* 41 F.Supp.2d 505, 516 n. 7 (D.N.J.1999).

**2.** The summary judgment record does not indicate clearly the exact dates for any of the 1997 events.

*Id.* at 263–67. He was sent back to Hightstown. *Id.* at 269.

On February 14, 1998, Longoria was transferred to Cranbury Station, a unit of the New Jersey State Police responsible for patrolling the New Jersey Turnpike. *Id.* at 217–18; Def.'s R. 56.1 Statement ¶ 2. On Longoria's first night at Cranbury, he accompanied another trooper, Daniel Borowick, on patrol. Longoria Depo. at 522. According to Longoria, Borowick twice stopped motorists for no obvious reason other than that they were "driving while black." *Id.* at 529–45. Longoria and Borowick also stopped to question a third motorist, whom Borowick referred to with a racial slur. *Id.* at 543.

Longoria also testified at his deposition that, during his time at Cranbury, other state troopers stopped primarily black and Hispanic motorists. *Id.* at 677–83, 704–05, 709–10. He claimed that in "locker room" conversations and elsewhere the other troopers often used ethnic slurs to describe the suspects they detained. *Id.* at 736.

Disturbed by what he perceived to be the cloud of racism surrounding the Cranbury barracks, Longoria requested a transfer to the Diesel Emissions Unit ("DEU"). Compl. ¶ 15. Longoria's transfer was granted on April 11, 1998. Def.'s R. 56.1 Statement ¶ 3. The main responsibility of the DEU is to inspect trucks for compliance with safety and emissions standards.

Longoria's hours at the DEU were, officially, 6:00 a.m. to 2:00 p.m. During the time Longoria was assigned to the DEU, he was also attending classes at a community college in pursuit of an associate's degree. In order to juggle both his work and class schedules, Longoria sought and received permission from his supervisor, Lieutenant Flynn, to work a modified shift, from 5:00 a.m. to 1:00 p.m. Bellaran

Depo. at 80–81. During the beginning of Lieutenant Flynn's tenure as Longoria's supervisor, these hours included so-called "portal to portal" time-in other words, a trooper was considered to be on duty during the time he was driving to or from work. *Id.* at 89–90.

On July 18, 1998, Captain Joseph Sarnecky ("Sarnecky") assumed command of the Traffic Bureau, including the DEU. At about the same time, Lieutenant Joseph Wattai ("Wattai") was also transferred to the Traffic Bureau. At some point after taking over the Traffic Bureau, Sarnecky changed the "portal to portal" policy, so that troopers did not receive credit for time spent commuting to their job site.

Sarnecky and Wattai made an unannounced visit to Longoria's post on September 15, 1998. Def.'s R. 56.1 Statement ¶ 8. Longoria was not there; his "patrol log" for that date indicated that he had signed off duty at 12:53 p.m. *Id.*; McLaughlin Aff. Exh. Q. Several days later, on September 21, 1998, Longoria met with his local supervisors to discuss the modified shift arrangement. Longoria Depo. at 974. While he was told that the Division was unhappy with his schedule, he was not actually ordered to change it. McLaughlin Aff. Exh. L. However, on October 15, 1998, Sarnecky and Wattai made another unannounced visit to Longoria's post, and again found him absent. Def.'s R. 56.1 Statement ¶ 10. His "patrol log" for that day indicated that he had signed off at 1:04 p.m. *Id.*; McLaughin Aff. Exh. V. On October 19, 1998, Longoria met with Sarnecky, who ordered him either to submit a special report explaining the cause for his absences, or to request a transfer out of the DEU. Longoria requested a transfer to the Fort Dix Station the same day. After just two months at Fort Dix, Longoria was told that he was to be transferred back to Cranbury Station.

On February 4, 1999, Longoria filed this suit, seeking money damages, an injunction barring his latest transfer, and retroactive promotion to Sergeant, pursuant to 42 U.S.C. § 2000e ("Title VII"), 42 U.S.C §§ 1981 and 1983, and the New Jersey Law Against Discrimination, N.J. Stat. Ann. §§ 10:5–1 to –42 ("NJLAD"). Some four months later, on June 15, 1999, Longoria filed a Charge with the EEOC, alleging substantially the same incidents that form the basis for this action. McLaughlin Aff. Exh. F. On September 12, 2000, the Defendants filed a motion for summary judgment pursuant to Rule 56. Longoria then made an application to Magistrate Judge Rosen to reopen discovery. At a November 22, 2000 status conference, Judge Rosen granted a limited reopening of discovery, at which point Defendants withdrew their summary judgment motion without prejudice. On March 19, 2001, Defendants renewed their summary judgment motion, relying upon their original papers. Longoria filed a cross-motion for summary judgment on April 10, 2001. As the state-officer defendants have been sued in their official as well as individual capacities, the present holders of the relevant offices have been substituted pursuant to Fed.R.Civ.P. 25(d).

I have jurisdiction over Longoria's federal claims pursuant to 28 U.S.C. § 1343, and supplemental jurisdiction over his New Jersey claims pursuant to 28 U.S.C. § 1367.

## III. DISCUSSION

### A. Summary Judgment Standard

"On a motion for summary judgment, the court must determine whether the evidence shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir.1999) (citing Fed.R.Civ.P. 56(c)). "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, *249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); see also Abraham,* 183 F.3d at 287. "Thus, while the nonmoving party must present enough evidence to demonstrate a dispute is genuine, all inferences in interpreting the evidence presented by the parties should be drawn in favor of the nonmoving party." *Abraham,* 183 F.3d at 287 (citing *Boyle v. County of Allegheny Pa.,* 139 F.3d 386, 393 (3d Cir.1998)). "Cases that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment." *Id.*

### B. Federal Claims

#### 1. Title VII

The Defendants argue that Longoria's claims under Title VII are barred because he failed to exhaust his administrative remedies prior to filing suit in federal court. Def.'s Br. at 13–14. Title VII plaintiffs may not seek relief or redress in federal court for any claim that has not first been presented to the United States Equal Employment Opportunity Commission. *See* 42 U.S.C. §§ 2000e–5(b), (f) (2000); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Seredinski v. Clifton Precision Prods. Co.,* 776 F.2d 56, 61 (3d Cir.1985) ("To bring a civil action under Title VII, an aggrieved party must first file a complaint with EEOC and, if the complaint is not resolved at the administrative level, obtain a 'right-to-sue' letter from EEOC."). "The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion...." *Antol v. Perry,* 82 F.3d 1291, 1296 (3d Cir.1996). Longoria

filed his EEOC Charge four months after the initiation of this suit. *See* McLaughlin Aff. Exh. F. Plainly, the EEOC was not given an opportunity to settle the dispute between Longoria and the Defendants before it reached this Court. In addition, there is no evidence in the summary judgment record that Longoria has ever received a right to sue letter from the EEOC. Accordingly, I must conclude that his claims under Title VII cannot proceed.

### 2. Claims Under Sections 1981 and 1983

Longoria asserts, albeit with no great clarity or particularity, a variety of potential violations of his rights under 42 U.S.C. §§ 1981 and 1983. Taken at its broadest, the Complaint appears to make out discrimination claims based upon two distinct failures to promote, an involuntary transfer, and a generally hostile, racially charged environment at the New Jersey State Police. In addition, the Complaint suggests strongly that Longoria suffered harassment, and perhaps the involuntary transfer, in retaliation for his association with a fellow trooper, Sergeant Vincent Bellaran III ("Bellaran"), who had won a Title VII suit against a New Jersey State Police Captain. While Longoria does not appear actually to argue the legal basis for most of these claims, he might, construing his briefs generously, be said to have come forward with at least some evidence supporting many of them. Thus, I shall give due consideration to each of the claims fairly presented in the Complaint.

### a. The State Defendants—All Claims

 Defendants, State of New Jersey and Division of State Police, assert that they cannot be sued under 42 U.S.C. § 1983 because they are not "persons" for purposes of the statute. Def.'s Br. at 22.[3] It is well settled that the States are not "persons" within the meaning of § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). A subdivision of the state itself is also not a "person" if it is merely an alter ego or "arm" of the state. *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 658–59 (3d Cir.), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989); *see also Pennhurst State School & Hosp. v. Halderman,* 465 U.S. 89, 101–02, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984); *Christy v. Pennsylvania Turnpike Comm'n,* 54 F.3d 1140, 1144 (3d Cir.), *cert. denied,* 516 U.S. 932, 116 S.Ct. 340, 133 L.Ed.2d 238 (1995). Whether or not a governmental entity is an arm of the state turns on: (1) whether payment for any judgment would come from the state; (2) the status of the entity under state law; and (3) what degree of autonomy the entity has. *Fitchik,* 873 F.2d at 659. Two of my colleagues have previously concluded that the Division of State Police is an arm of the State of New Jersey, although without elaborate consideration of the *Fitchik* factors. *See Nannay v. Rowan College,* 101 F.Supp.2d 272, 283 (D.N.J.2000); *Simmerman v. Corino,* 804 F.Supp. 644, 650 (D.N.J.1992), *aff'd,* 16 F.3d 405 (3d Cir.1993).

 The Division of State Police is plainly an arm of the State of New Jersey under this analysis. The New Jersey Code does not provide for any means of independent funding of the Division of

---

3. "Every person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law...." 42 U.S.C. § 1983 (2000).

State Police. This year, the legislature appropriated funds for the Division directly from the state budget, in the amount of $215,579,000. *See* 2001 N.J. Laws c. 130 § 66. The Division is a subsidiary of the Department of Law and Public Safety, a principal department of the State Executive Branch. *See* N.J. Stat. Ann. §§ 52:17B–1 to –3 (2001). The head of the Division is appointed by the Governor, with the advice and consent of the Senate, although he or she may only be removed for good cause. *Id.* at 52:17B–7, 53:1–2. It does not appear that the Division is separately incorporated, or invested with the power to sue or be sued on its own behalf. As a unit within the Executive Branch, the Division enjoys relatively little autonomy. In short, all of the *Fitchik* factors suggest strongly that the Division of State Police is an arm of the state, and, as such, I conclude that it is not subject to suit under § 1983.

**b. Sarnecky and Wattai—Involuntary Transfer**

■ Longoria alleges that his transfer from the Diesel Emissions Unit back to the Fort Dix Station, although voluntary, was the result of a design by Captain Sarnecky to discriminate against Longoria and punish him for his association with Bellaran. *See* Compl. ¶¶ 24–25. Longoria also claims that a proposed subsequent transfer, from Fort Dix to Turnpike duty, was also arranged by Sarnecky for the same reasons. *Id.* ¶ 39. While Wattai's role in the transfers is unclear from the summary judgment record, Longoria claims that Wattai made statements indicating hostility towards Bellaran and associates of Bellaran. *Id.* ¶ 21; Longoria Depo. at 1076–77.

■ The essential prima facie case for discriminatory transfer is familiar, whether in a Title VII or a § 1983 context. To make out a claim, the plaintiff must show that he or she was: (1) a member of the protected class; (2) qualified for the position he or she sought; and (3) that nonmembers of the protected class were treated more favorably—in the case of transfer, that comparably situated employees were not transferred. *See Goosby v. Johnson & Johnson Medical, Inc.,* 228 F.3d 313, 318–19 (3d Cir.2000) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)). Longoria points to nothing in the summary judgment record, and my own independent review of the record reveals nothing, to demonstrate any differential treatment of Hispanic and non-Hispanic officers in the transfer process. Since, arguably, Longoria's transfer was the result of a close scrutiny of his work hours by his superiors, I also examined the summary judgment record for evidence that other officers in the Diesel Emissions Unit were not also held to very strict compliance with their assigned work hours. I found no such evidence. Having failed to carry his initial burden, Longoria cannot proceed with this aspect of his claims against Sarnecky and Wattai.

■ Similarly, Longoria also has failed to come forward with any evidence establishing a prima facie case of retaliation by Sarnecky or Wattai. In a typical retaliation case, be it under Title VII or the First Amendment, a plaintiff must show that: (1) he or she engaged in a protected activity; (2) the employer took an adverse employment action against him or her after or contemporaneous with the protected activity; and (3) that there is a causal link between his or her participation in the protected activity and the adverse employment action. *See Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 286 (3d Cir.2001); *Jones v. School Dist. of Philadelphia,* 198 F.3d 403, 410 (3d Cir.

1999). The scope of the "protected activity" is defined by the law or constitutional provision the plaintiff alleges is violated by the retaliation. In this case, Longoria has not identified any particular such statute or constitutional proviso, other than Title VII. Title VII protects those who "opposed any practice made an unlawful employment practice by [Title VII]," or those who "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a) (2000).

 Longoria's evidence establishes, at best, that Sarnecky and Wattai scrutinized him and transferred him because of Longoria's association with Vincent Bellaran. While that motive, if true, does no honor to the Division of State Police, and is certainly undesirable as a matter of public policy, it does not represent a violation of Title VII. Mere friendship or relation to one who has made a charge or brought suit is not "opposing" an unlawful practice, nor is it "assist[ing]," or "participat[ing]" in an investigation or proceeding. *See Fogleman v. Mercy Hosp., Inc.*, 91 F.Supp.2d 788, 792–93 (M.D.Pa.2000) (citing *Holt v. JTM Industries, Inc.*, 89 F.3d 1224, 1225–27 (5th Cir.1996), *cert. denied*, 520 U.S. 1229, 117 S.Ct. 1821, 137 L.Ed.2d 1029 (1997)). Longoria points to no other evidence in the summary judgment record that he has engaged in any sort of protected activity.[4] As a result, I must grant the Defendants' motion on these claims.

### c. Verniero and Williams—Individual Capacities—All Claims

 Longoria has asserted claims against Peter Verniero, the Attorney General of New Jersey at the time this suit was initiated ("Verniero"), and Carl A. Williams ("Williams"), who at that time was Superintendent of the New Jersey State Police, in both their individual and official capacities. As noted, *supra*, the current holders of each of those respective offices have been substituted for Verniero and Williams in their official capacities. *See* Fed.R.Civ.P. 25(d). I have previously determined that supervisory officials acting under color of state law may only be sued in their individual capacities under §§ 1981 and 1983 where the individual defendant is "personally involved in the alleged wrongs." *Santiago v. City of Vineland*, 107 F.Supp.2d 512, 540 (D.N.J.2000) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988)). "Personal knowledge can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.*

 There is absolutely no evidence in the summary judgment record that either Verniero or Williams personally directed or had actual knowledge of any discrimination against Longoria. Instead, Longoria has submitted lengthy, unabridged transcripts of the New Jersey Legislature's hearings pertaining to racial profiling. The debate about the practice of racial profiling is simply irrelevant to Longoria's claim. That Verniero and/or Williams knew of some discriminatory law enforcement practices by New Jersey State Troopers during the period of Longoria's employment—even assuming that is established by the transcripts—proves nothing about their actual knowledge of any discriminatory work environment or

---

4. In his deposition, Longoria appeared to suggest that some hostility at Cranbury Station, and perhaps later, stemmed from an incident in which he may have indicated that he was opposed to the practice of "profiling" motorists. *See* Longoria Depo. at 719–20, 741. Since he has neither pleaded nor argued this alleged incident as a basis for a retaliation claim, I shall not consider whether his "monologue," as he termed it, *id.* at 719, can comprise a protected activity.

practices related to Longoria, or indeed with regard to the Division of State Police more generally. As the Third Circuit's discussion in *Rode* makes clear, "actual knowledge" means just that—the defendants must have actually known of, and acquiesced in, the unlawful conduct against the plaintiff. *See Rode*, 845 F.2d at 1207–08 (citing *Parratt v. Taylor*, 451 U.S. 527, 537 n. 3, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981)). Longoria points to nothing to indicate that his name, and his allegations, would come as anything other than a complete surprise to Verniero and Williams. Thus, neither can be liable in their individual capacities.

### d. Farmer, Dunbar, Sarnecky, and Wattai—Official Capacities—All Claims

 Longoria's remaining claims are against individual state officers acting in their official capacities. Because a suit against an officer in his or her official capacity is effectively a suit against the state itself, only prospective injunctive relief is available against such defendants, absent a waiver by the state of its sovereign immunity. *See Edelman v. Jordan*, 415 U.S. 651, 664–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (citing *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Relief may only be had when there is an ongoing violation of federal law extant at the outset of the suit. *See B.H. Papasan v. Allain*, 478 U.S. 265, 278, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (holding that *Ex parte Young* exception to state's sovereign immunity applies only where violation of federal law is ongoing, not where federal law was violated only in the past); *Milliken v. Bradley*, 433 U.S. 267, 289–90, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (*Ex parte Young* applies to official-capacity de-

fendants who were in violation of federal law at the time suit was filed). In order to obtain permanent injunctive relief, the movant must: (1) demonstrate that exercise of equity jurisdiction is proper; (2) actually succeed on the merits of his or her claim; and (3) demonstrate that the balance of equities tips in his or her favor. *See Roe v. Operation Rescue*, 919 F.2d 857, 867 n. 8 (3d Cir.1990).

 Longoria's hostile work environment claim fails the test of *Papasan* and *Milliken*. Longoria alleges a long series of racially charged remarks by supervisors and fellow troopers, stretching from his days at the State Police Academy through his posting at the time of suit, at Fort Dix. Pl.'s Br. at 8–10, 14–20, 31. For instance, he claims that a sergeant at Fort Dix made a distasteful remark about "niggers" in his presence. Longoria Depo. at 1188. However, Longoria does not even allege, let alone point to any evidence of, discrimination at Fort Dix against members of his own race. To the extent that there was any violation of federal law at the time of his suit, then, he lacks standing to assert it.[5]

 The involuntary transfer and failure to promote claims, while arguably still continuing at the time of Longoria's suit, simply fail on their merits. I have already analyzed the transfer from the DEU to Fort Dix. *See* III.B.2.b., *supra*. For similar reasons, I find that Longoria has not carried his burden on the claims stemming from his failure to obtain a pair of specialist positions. *See* Compl. ¶ 8. Although Longoria has presented a prima facie case, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Defendants assert that those hired for the positions Longoria

---

**5.** I also note that Longoria presents scant evidence of harassing or racist comments

against Hispanics at any time during his tenure.

sought were scored higher by the interviewing committees. Def.'s Br. at 6; McLaughin Aff. Exhs. C–D, DD. Longoria has not come forward with any admissible evidence to demonstrate that the scoring list was merely a pretext for discrimination. In his deposition, he asserts his personal conviction, based not on personal knowledge but rather on hearsay, that other applicants were selected over him because of their superior political connections. *See* Longoria Depo. at 249–50. Even if I were permitted to consider this statement, it still would not establish that the scoring list was a pretext for *discrimination.*

Since Longoria's claims fail on the merits, injunctive relief is not appropriate. Accordingly, I must grant summary judgment on the official capacity claims.

### C. SUPPLEMENTAL JURISDICTION

█ Since I have dismissed all claims under which Longoria can claim federal jurisdiction, I shall exercise my discretion to dismiss the remaining claims pursuant to 28 U.S.C. § 1367(c)(3).[6] These claims will be dismissed without prejudice to Longoria's right to pursue them in the courts of New Jersey. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); *Tully v. Mott Supermarkets,* 540 F.2d 187, 196 (3d Cir. 1976) (holding that only "exceptional circumstances" on the level of the "invocation of a significant federal policy" or severe prejudice or unfairness to the parties should be considered as a basis for exercising supplemental jurisdiction when state

law predominates); *Kadetsky v. Egg Harbor Township Bd. of Educ.,* 164 F.Supp.2d 425, 435–36 (D.N.J.2001) (Orlofsky, J.).

### IV. CONCLUSION

For the reasons set forth above, I shall grant the Defendants's motion for summary judgment on Longoria's federal claims, and, in the exercise of my discretionary power under 28 U.S.C. § 1367, dismiss the supplemental state law claims without prejudice. I shall also deny Plaintiff's cross-motion for summary judgment. The Court will enter an appropriate form of order.

---

**6.** "The district court may decline to exercise supplemental jurisdiction over a claim under subsection (a) if-

(3) the district court has dismissed all claims over which it has original jurisdiction...." 28 U.S.C. § 1367(c) (2000).