

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-18-2006

# Febres v. Camden Bd Education

Precedential or Non-Precedential: Precedential

Docket No. 05-1178

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Febres v. Camden Bd Education" (2006). *2006 Decisions*. Paper 1180.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1180

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 05-1178

———————

HERMINIO FEBRES; LARRY WILLIAMS; DAVID SIMS;
DEREK COPELAND; ROBERT HAWKINS;
CHARLES E. SMITH; JUAN A. DIAZ;
NELSON ALEXANDER; THE ESTATE OF ROBERT
HAWKING; ESTATE ANGEL PAGAN

v.

THE CAMDEN BOARD OF EDUCATION

Herminio Febres, Larry Williams, David Sims,
Derek Copeland, Robert Hawkins, Charles E. Smith,
Juan A. Diaz, Nelson Alexander,

Appellants

———————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 01-cv-02844)
District Judge: Honorable Robert B. Kugler

————

Argued: November 16, 2005

Before: BARRY and AMBRO, <u>Circuit</u> <u>Judges</u>,
and POLLAK,[*] <u>District</u> <u>Judge</u>.

———————————

[*] Honorable Louis H. Pollak, District Judge for the United
States District Court for the Eastern District of Pennsylvania,
sitting by designation.

————

(Opinion Filed: April 18, 2006)

————

Rosemarie Cipparulo, Esq.  (Argued)
Weissman & Mintz LLC
One Executive Drive, Suite 2000
Somerset, NJ 08873

Counsel for Appellants

Louis Lessig, Esq.  (Argued)
William M. Tambussi, Esq.
Brown & Connery, LLP
360 Haddon Avenue
Westmont, NJ 08108

Counsel for Appellee

————

OPINION OF THE COURT

————

POLLAK, District Judge:

Appellants Herminio Febres, Larry Williams, David Sims, Derek Copeland, Charles Smith, Juan Diaz, Nelson Alexander, and now-deceased Angel Pagan and Robert Hawkins were employed by the appellee Camden Board of Education ("Board") as custodians and mechanics.  On or about June 26, 2000, they were fired for excessive absenteeism.  Appellants brought this suit in the United States District Court for the District of New Jersey, invoking the self-care provision of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2612(a)(1)(D), to contest their terminations.  The District Court granted appellee's motion to dismiss on Eleventh Amendment jurisdictional grounds, holding that the Board is an "arm of the state." *Cf. Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).  The District Court concurrently denied

appellants' motion for leave to amend their complaint to add claims under 42 U.S.C. § 1983 against various school district administrators and officials of the Board.

Appellants now appeal the District Court's order. Appellants' primary target is the Eleventh Amendment ruling: if we reverse the District Court's jurisdictional ruling, then we are not asked to address the denial of appellants' motion for leave to amend.

We have appellate jurisdiction under 28 U.S.C. § 1291. Our review is plenary. *See Farley v. Phila. Housing Auth.*, 102 F.3d 697 (3d Cir. 1996). Because we conclude that the Board has not established it is an arm of the state, we will reverse.

## I.

The Eleventh Amendment provides unconsenting states with immunity from suits brought in federal courts by private parties. *See Edelman v. Jordan*, 415 U.S. 651 (1974). The Supreme Court has long held that counties, municipalities and political subdivisions of a state are not protected by the Eleventh Amendment. *See Mt. Healthy*, 429 U.S. at 280; *see also Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 814 (3d Cir. 1991) (en banc). School boards and school districts are typically considered political subdivisions of a state, not entitled to immunity. *See, e.g.*, *Mt. Healthy*, 429 U.S. at 280-281; *Lester H. v. Gilhool*, 916 F.2d 865, 870-71 (3d Cir. 1990). In some cases, however, such entities may be viewed as "arm[s] of the State partaking of the State's Eleventh Amendment immunity . . . ." *Mt. Healthy*, 429 U.S. at 280; *see Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 (1984) (holding that the Eleventh Amendment bars actions in federal court whenever "the state is the real, substantial party in interest"). The party asserting immunity bears the burden of production and persuasion. *See Christy v. Pa. Turnpike Comm'n*, 54 F.3d 1140, 1144 (3d Cir. 1995).

More than thirty-five years ago the Third Circuit identified nine factors to be considered when determining whether an entity is an arm or alter ego of the state for Eleventh

Amendment purposes. *Urbano v. Bd. of Managers*, 415 F.2d 247, 250-51 (3d Cir. 1969). The numerous factors articulated in *Urbano* were subsequently condensed into three major criteria: (1) whether the payment of the judgment would come from the state, (2) what status the entity has under state law, and (3) what degree of autonomy the entity has. *Fitchik v. N.J. Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989) (en banc).[1] The three-part test—sometimes referred to as the *Fitchik* test—has been reiterated and applied many times since. *See, e.g.*, *Carter v. City of Phila.*, 181 F.3d 339, 347 (3d Cir. 1999); *Christy*, 54 F.3d at 1144-45; *Peters v. Del. River Port Auth.*, 16 F.3d 1346, 1350-52 (3d Cir. 1994); *Bolden*, 953 F.2d at 816.

We now accord equal consideration to all three prongs of the analysis—payment from the state treasury, status under state law, and autonomy. *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239-40 (3d Cir. 2005).[2] However, in *Hess v. Port Authority Trans-Hudson Corp.*, the Supreme Court instructed that in close cases, where "indicators of immunity point in different directions," 513 U.S. 30, 47 (1994), the principal rationale behind the Eleventh Amendment—protection of the sovereignty of states through "the prevention of federal-court judgments that

---

[1] The test incorporates the considerations outlined by the Supreme Court in *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391 (1979), and is consistent with *Pennhurst*, 465 U.S. 89. *See Fitchik*, 873 F.2d at 659. *Fitchik* eliminated one of the original nine *Urbano* factors, which distinguished between governmental and proprietary functions, following the Supreme Court's decision in *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528 (1985).

[2] Historically, we have regarded the first criterion—whether payment would come from the state (referred to as the "funding factor" or the "state-treasury criterion")—as the most important consideration, although not alone dispositive. *See Fitchik*, 873 F.2d at 659. In *Benn*, we concluded that "we can no longer ascribe primacy to the first factor" and therefore "[relegated] financial liability to the status of one factor co-equal with others in the immunity analysis." 426 F.3d at 239, 240.

must be paid out of a State's treasury," *id.* at 48—should "remain our prime guide." *Id.* at 47; *see id.* at 52 (identifying states' solvency and dignity as the concerns underpinning the Eleventh Amendment).

## II.

The controversy over classification of the Camden Board of Education centers around the first and third criteria of the *Fitchik* test. The Board's legal status under state law, the second criterion, clearly militates against immunity.

### A. The Status of the Board Under State Law

Four sub-factors are relevant to assessing the Board's legal status under state law: how state law treats the Board generally, whether the Board can sue or be sued in its own right, whether the Board is separately incorporated, and whether it is immune from state taxation. *See, e.g.*, *Carter*, 181 F.3d at 347 n.22; *Fitchik*, 873 F.2d at 662-63. As the District Court noted in its oral opinion, the Board can sue or be sued under state law, is separately incorporated, and is not immune from state taxation. *See* N.J. Stat. Ann. §§ 18A:10-1, 11-2. Moreover, New Jersey state law generally treats school boards as separate political subdivisions. *See id.* § 18A:10-1; *see, e.g.*, *Otchy v. Elizabeth Bd. of Educ.*, 737 A.2d 1151 (N.J. Super. Ct. App. Div. 1999) (noting that under state law a school board is a distinct legal entity, which, for example, may hold property in its name).

In 2002, the New Jersey legislature enacted the Municipal Rehabilitation and Economic Recovery Act ("MRERA"), N.J. Stat. Ann. §§ 52:27BBB-1 to -65, which provides that a municipality fulfilling specified criteria[3] will be designated a

---

[3] The MRERA applies to any New Jersey municipality: (1) that has been subject to the supervision of a financial review board pursuant to the 'Special Municipal Aid Act,' P.L.1987, c. 75 (C.52:27D-118. 24 et seq.) for at least one year; (2) that has been subject to the supervision of the Local Finance

"qualified municipality" and subjected to a series of measures to try to alleviate its ongoing fiscal distress. *See* N.J. Stat. Ann. §§ 52:27BBB-1 to -3, -7 to -30. Camden has been so designated. *See Camden City Bd. of Educ. v. McGreevey*, 850 A.2d 505 (N.J. Super. Ct. App. Div. 2004) (upholding the MRERA). The MRERA also provides for "limited school district oversight" in these qualified municipalities. N.J. Stat. Ann. § 52:27BBB-2.1(c)-(d); *see id.* §§ 52:27BBB-63 to -64 (regarding appointment of school board members and gubernatorial veto power).

The District Court suggested that the Governor's power, under the MRERA, to veto actions taken at school board meetings abrogated the Board's status as a separate political entity. *Cf. id.* § 52:27BBB-64. This, however, conflates the second and third criteria of the *Fitchik* test; the gubernatorial veto is better addressed with regard to the Board's autonomy. *See* discussion *infra*; *Fitchik*, 873 F.2d at 660, 663-64 (addressing gubernatorial veto power under the autonomy prong of the arm-of-the-state analysis).

In sum, the various factors relating to the Board's "status under state law" support appellants' contention that the Board is not an arm of the state and therefore not entitled to immunity.

### B. The Board's Degree of Autonomy

The District Court concluded that the "autonomy factor" weighed heavily in favor of immunity based on the MRERA's grant of veto and appointment powers to the Governor. We find that this factor weighs only slightly in favor of the Board's

---

Board pursuant to the 'Local Government Supervision Act (1947),' P.L.1947, c. 151 (C.52:27BB-1 et seq.) for at least one year; and (3) which, according to its most recently adopted municipal budget , is dependent upon State aid and other State revenues for not less than 55 percent of its total budget.

N.J. Stat. Ann. § 52:27BBB-3.

immunity.

According to the MRERA, the minutes of any meeting of the Board must be delivered to the Governor. Further, according to the Act, the actions taken by the Board at a meeting become effective fifteen days after delivery, unless during the fifteen-day period the Governor (1) approves the minutes, in which case the Board's actions become effective upon that approval, or (2) vetoes any action taken by the Board at that meeting, in which case the vetoed action does not take effect. *See* N.J. Stat. Ann. § 52:27BBB-64(b).

We note that the Governor's veto power is constrained, in accord with the "limited school district oversight" the MRERA describes, since the Governor has a limited period to respond to the Board's actions, and the default remains that the Board's actions have force or effect after approximately two weeks. Moreover, the Board continues to control its agenda, pursuant to its powers to act under N.J. Stat. Ann. § 18A:11-1.

The MRERA also grants the Governor the power to appoint members of the Board: the Act provides for a temporary increase in the size of the school board from nine members to twelve, to allow the Governor to appoint three members. *See* N.J. Stat. Ann. § 52:27BBB-63(h). The MRERA states that "to ensure substantial local representation on any such board, in no case shall the number of the positions appointed by the [municipality's] mayor and elected by the voters, combined, constitute less than a majority of the total positions on the board." *Id.* § 52:27BBB-63(a).

The Board argues, by way of comparison, that it is significantly less autonomous than entities which have been held *not* to be arms of the state, and cites *Kovatz v. Rutgers*, 822 F.2d 1303, 1312 (3d Cir. 1987) (holding that Rutgers University was "largely autonomous and subject only to minimal state supervision and control"). (Appellees' Brief at 9.) We note, however, that even in the case of Rutgers University, members of the University's two governing bodies were appointed by the Governor with the advice and consent of the state senate. *Rutgers*, 822 F.3d at 1311 (noting that at least six of the eleven

members of the Board of Governors were appointed in this way, and that the eleven state-appointed members of the Board of Trustees were responsible for, in turn, selecting up to fifty additional trustees to serve with them).

Gubernatorial appointment of board members typically weighs only "slightly" in favor of immunity. *See, e.g.*, *Christy*, 54 F.3d at 1149 (finding that the state controlled the membership of the Pennsylvania Turnpike Commission and holding, on balance, that this weighed "slightly" in favor of alter ego status and immunity); *Peters*, 16 F.3d at 1351-52 (finding that New Jersey and Pennsylvania appointed all sixteen members of the Board of Commissioners of the Delaware River Port Authority and holding that this weighed "slightly" in favor of alter ego status and immunity); *Bolden*, 953 F.2d at 820 (finding that the state appointed one-third of SEPTA's board members but holding that SEPTA was autonomous).

While we agree that in the case before us the Board may be subject to more overall state oversight than Rutgers University, we note that other entities which have been held by this Court *not* to be arms of a state have been subject to state controls strikingly similar to those placed upon the Board. *Fitchik v. N.J. Transit Rail Operations, Inc.* offers a close comparison to the case before us: "three out of seven of the [New Jersey Transit] board members [were] required to be members of the [state's] executive branch, and the Governor ha[d] veto power over the board's actions." 873 F.2d at 663 (citing N.J. Stat. Ann. § 27:25-4). Much like the Camden Board of Education, New Jersey Transit ("NJT") was required to deliver minutes of its board meetings to the Governor, so that, within the designated time period, the Governor could veto any proposed board action. *See* N.J. Stat. Ann. § 27:25-4(f); *see also Fitchik*, 873 F.2d at 663; *id.* at 668 (Rosenn, J., dissenting). We held that while NJT was "not 'highly autonomous' like *Rutgers*," it was still "significantly autonomous" and concluded that the autonomy factor only "counsel[ed] slightly in favor of according immunity to NJT." *Fitchik*, 873 F.2d at 664; *see also Hess*, 513 U.S. at 47 (finding that the Port Authority was not an arm of the states of New York and New Jersey, even though the "States appoint and can remove the commissioners, the Governors can

8

veto Port Authority actions, and the States' legislatures can determine the projects the Port Authority undertakes").

Guided by our case law, we find that the autonomy factor slightly favors the Board's immunity. Since the Board's legal status, *supra*, plainly suggests the opposite result, we observe that the indicators of immunity point in different directions. Thus, the question of the state's financial liability—which we turn to next—is particularly significant. *Cf. Hess*, 513 U.S. at 47, 48-50.

**C. The State Treasury's Liability for the Payment of the Judgment**

In support of its holding, the District Court referenced a prior New Jersey district court opinion, which found that the Camden Board of Education was entitled to alter ego status because of its limited autonomy and "[b]ecause the vast majority of the School Board's funding [came] from the State of New Jersey." *Camden County Recovery Coal. v. Camden Bd. of Educ.*, 262 F. Supp. 2d 446, 450 (D.N.J. 2003) (granting the Board's cross-motion to dismiss, and dismissing as moot an order to show cause why a preliminary injunction, requested by plaintiffs, should not be granted). The *Camden County Recovery Coalition* court reported that approximately 85% to 90% of the Board's monies came from the state, and concluded this left "no question" that "any judgment against the School Board [would] lead to the direct expenditure of state funds in order to comply with such a judgment." *Id.* at 449.

In the case at bar, the District Court's analysis of the *Fitchik* prong that we will term the "state-treasury criterion"[4] similarly attributed overwhelming significance to the fact that Camden is "almost entirely State funded." (A34.) The court

---

[4] While this prong of arm-of-the-state analysis has frequently been referred to in the case law as the "funding factor" or "funding analysis," we think it may be closer to the mark to describe it as the "state-treasury criterion" or "state-treasury analysis."

reasoned that, given the magnitude of the state's funding, any judgment "would ultimately have to be paid by state funds." (A33.) The District Court acknowledged that this was not because New Jersey bears any affirmative, legal obligation to satisfy a judgment against the Board—either directly or by reimbursing the Board. Rather the court concluded that, as a practical matter, it was inevitable that funds provided by the state would be used to pay a judgment and that such funds would have to be replaced by the state. (A20, A22.) In fact, the District Court concluded that New Jersey's "indirect liability" was so compelling an indicator of immunity that the court deemed all other funding-related considerations irrelevant. (A20, A32.)

On appeal, the Board's argument mirrors the reasoning articulated by the *Camden County Recovery Coalition* court and the District Court in this case. The Board's brief asserts: "If the [Board's] only significant revenue stream is the State of New Jersey, it stands to reason that any judgment owed would in fact be coming directly from State funding, even though it is commingled with a minuscule amount of funds from the local municipality." (Appellees' Brief at 7.) At oral argument, the Board also contended that practical necessity would require New Jersey to replenish any funds used by the Board to pay a judgment. The Board argues that immunity is appropriate where the state makes such an "overwhelming financial contribution." (Appellees' Brief at 5.)

As explained *infra*, we find the Board's assertions, and the District Court's corresponding conclusions, unsupported by the record. Moreover, close consideration of our case law leads us to conclude that the Board's central argument side-steps the crux of the state-treasury criterion—whether the state treasury is legally responsible for the payment of a judgment against the Board. Contrary to the Board's contention, the fact that New Jersey is the principal source of the Board's finances does not alone confer immunity, or even compel a finding that this prong of the analysis favors immunity. *See Rutgers*, 822 F.3d at 1308,

10

1312;[5] *see also Mt. Healthy*, 429 U.S. at 280. We must consider the nature of the state's financial contributions to the Board.

## 1. State Funds Contributed to the Board's Budget

Whether an entity claiming immunity has, or can raise, sufficient funds to satisfy a judgment has typically been a factor in our state-treasury analysis. *See, e.g.*, *Peters*, 16 F.3d at 1350; *Fitchik*, 873 F.2d at 659-60. In the instant case, the District Court concluded that payment of a judgment would necessarily come from the portion of the Board's budget received from the state. We find this unsupported. The record before us indicates that Camden schools receive revenue from a number of sources. While non-state funds comprise a relatively small percent of the Board's budget, they still total a significant sum, with nearly $7.5 million in local taxes and nearly $25 million in federal grants in 2004-2005. (A48.)[6] In addition, the Board is

_____

[5] While we have consistently explained that the quantity or proportion of state funding received by an entity is not dispositive, we have described it as potentially probative. *See Blake v. Kline*, 612 F.2d 718, 723 (3d Cir. 1979); *see also Carter*, 181 F.3d at 348 (reasoning that "[t]he funding factor weighs even more heavily against immunity in this case than it did in *Fitchik* and *Bolden*," where larger portions of the agencies' funds came from the states); *Bolden*, 953 F.2d at 819 (similarly comparing the portion of the agency's funding contributed by the state with the portion contributed in *Fitchik*). *Rutgers* illustrates the limited weight that attaches to the size, absolute or relative, of the state's contribution, 822 F.3d at 1308 (noting that state funding, one of Rutgers' four sources of funding, composed up to seventy percent of the University's general operating account).

[6] As noted in *Camden County Recovery Coalition*, the state provides the lion's share of funding to the Camden schools. The state's sizeable contribution in part reflects Camden's status, dating back to the 1990s, as a so-called *Abbott* district. *Cf. Abbott v. Burke*, 575 A.2d 359 (N.J. 1990) (authorizing funds to provide remedial programs and services to disadvantaged students); N.J. Admin. Code §§ 6A:24-1.1 et seq.

statutorily authorized to raise revenues through taxes, pursuant to the Comprehensive Educational Improvement and Financing Act, N.J. Stat. Ann. § 18A:7F-5(d). Alternatively, to increase funds, the Board could undertake to reduce expenses, *cf. Fitchik*, 873 F.2d at 661, or, as counsel for the Board acknowledged in the District Court, sell assets (A14-15).

Furthermore, we are not persuaded that it is of legal consequence whether Board funds employed to satisfy a judgment were funds which had initially been provided by the state. The record does not suggest that New Jersey retains ownership or control of the funds appropriated to the Board. (A22.) As we noted in *Fitchik*, "[w]e do not see [the gubernatorial veto] as indicating state ownership of the money already in [an entity's] accounts. We think it, instead, to be relevant to the third factor . . . [,] autonomy." 873 F.2d at 660; *see also Christy*, 54 F.3d at 1146 (finding that the state's control over the Pennsylvania Turnpike Commission's "*authority to issue* bonds, notes, and other obligations falls short of indicating state ownership of funds obtained *through the issuance* of such bonds, notes, and other obligations" (emphasis in original)). The magnitude of the state's contribution does not alter the fact that, once deposited in the Board's accounts, these funds belong to the Board. If then used to pay a judgment, we can say only that the judgment was satisfied with the Board's monies. *Cf. Fitchik*, 873 F.2d at 661-62; *Rutgers*, 822 F.2d at 1308; *Blake v. Kline*, 612 F.2d 718, 723-24 (3d Cir. 1979); *cf. also Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*, 991 F.2d 935, 941 (1st Cir. 1993) (reaching the same conclusion).

It is undisputed that the Camden Board of Education has a relatively poor tax base and is less financially independent than many of the entities we have previously found not clothed with immunity, such as NJT, SEPTA, and Rutgers University. Nonetheless, given what the record before us discloses with respect to the Board's varied sources of existing and potential funds, the Board has not established that it cannot satisfy a judgment with its own monies. *Cf. Christy*, 54 F.3d at 1146-47.

**2. Additional State Funds to Compensate for Payment of a Judgment**

While the parties agree that New Jersey is not legally responsible for the Board's unassumed debts, the Board presses us to consider the likely impact of an adverse judgement: The Board alleges that New Jersey would be forced, as a practical matter, to increase its appropriations to refill the Board's coffers, following the Board's payment of a judgment.

Since the state is under no legal obligation to do so, such appropriations—if they were to be made—would constitute a voluntary or discretionary subsidy. (The fact that such a contribution might be sorely needed and greatly appreciated by the Board, would not alter the nature of the state treasury's obligations.) We have long held that a state's voluntary contributions to an entity do not create an Eleventh Amendment jurisdictional bar: "Although the [state] might well *choose* to appropriate money to [an entity] to enable it to meet a shortfall caused by an adverse judgment, such voluntary payments by a state simply do not trigger Eleventh Amendment immunity." *Christy*, 54 F.3d at 1147 (internal quotation marks omitted) (emphasis in original); *see, e.g.*, *Fitchik,* 873 F.2d at 661; *Blake*, 612 F.2d at 726.[7]

At the same time, we recognize that some of our case discussions can be read as intimating that attention may properly be given to the derivative consequences for the state that might flow from a substantial judgment against the sued entity. *See, e.g.*, *Carter*, 181 F.3d at 348 & n.25 (observing that any judgment would not be paid "directly or indirectly" by the state); *Bolden*, 953 F.2d at 819 (commenting that a state "might feel compelled as a practical matter to subsidize . . . financially pressed municipalities," but concluding that this "would not *necessarily* transform the recipients into alter egos of the state" (emphasis added)).

In *Hess*, the Supreme Court emphasized the import of

---

[7] Other circuits have reached the same conclusion. *See, e.g.*, *Barket, Levy & Fine, Inc. v. St. Louis Thermal Energy Corp.*, 948 F.2d 1084, 1087 (8th Cir. 1991).

legal liability, without disavowing practical considerations.[8] The Court queried, for example: "Is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No"—both legally and practically—then the Eleventh Amendment's core concern is not implicated." *Hess*, 513 U.S. at 51; *id.* at 45-46 (assessing the Port Authority's financial independence, as well as the states' legal liability for its debts).[9]

---

[8] In an earlier decision, the Supreme Court also explained that an agency may "invoke the [Eleventh] Amendment in order to protect the state treasury from liability that would have . . . essentially the same practical consequences as a judgment against the State itself." *Lake Country Estates, Inc.*, 440 U.S. at 401.

[9] The *Hess* Court acknowledged, in dicta, that immunity properly attaches where an agency in question "'is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries . . . .'" *Id.* at 50 (quoting *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218, 227 (D.C. Cir. 1986), and citing *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378 (9th Cir. 1993)). The facts of the two cases cited by the Court suggest the types of limited circumstances in which the Court might expect such concerns to require immunity, regardless of the state's legal liability.

In *Morris*, immunity was accorded to an interstate transit system. Analysis of both the entity's status under state law and its limited autonomy suggested it was an arm of the two states the transit system served. *Morris*, 781 F.2d at 226-28. While the states involved were not directly liable, Congressional funding for the system was made contingent upon the states' agreement to meet the system's operating deficits, which could include adverse judgments. And, from the beginning it was fully anticipated that the entity would have large deficits and thus continually be dependent on the states for its financial survival. *Id.* at 225-26. *Alaska Cargo Transport* held that the railroad at issue was entitled to immunity as an alter ego of the state, even though the state had expressly disclaimed liability for it by statute. The case turned on the critical function performed by the railroad in Alaska, and federal laws which essentially required the state to keep the railroad afloat. *Alaska Cargo Transp., Inc.*, 5 F.3d at 381.

More recent Supreme Court opinions, such as *Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997) and *Regents of the University of California v. Doe*, 519 U.S. 425 (1997), shed some further light on the role of state funding in arm-of-the-state analysis. *Doe*, in particular, illustrates the Court's emphasis on the question of legal liability. There, the Supreme Court, confronting a "narrow question," held that the University of California—an entity for which the state was legally liable and which had previously been deemed an arm of the state—retained immunity even when the state had been indemnified, such that a final judgment would actually be paid by the federal government. *Doe*, 519 U.S. at 426, 430-31. The case thus stands, at least, for the proposition that an entity's immunity is not vitiated when the state, which is legally liable, does not actually pay a judgment. Although, as a California court later observed, it does "not follow that the converse is also true, i.e., that if an entity uses funds provided by the state to pay a judgment for which the state is not legally liable, there can be no immunity," *Kirchmann v. Lake Elsinore Unified Sch. Dist.*, 83 Cal. App. 4th 1098 (Cal. Ct. App. 2000), *Doe* effectively conveyed the centrality of legal liability: "Of course, the question whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued." *Doe*, 519 U.S. at 430.[10] The Court further explained:

> Just as with the arm-of-the state inquiry, . . . with respect to the underlying Eleventh Amendment question it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant.

*Id.* at 431; *see Benn*, 426 F.3d at 239 (quoting *Doe* for this proposition); *Cash v. Granville County Bd. of Educ.*, 242 F.3d

---

[10] We do not mean to suggest that *Doe* was a departure from *Hess*. To the contrary, *Doe* here draws upon *Hess*, including the portion we have quoted, *supra*.

219, 224-25 (4th Cir. 2001); *Duke v. Grady Municipal Schs.*, 127 F.3d 972, 980-82 (10th Cir. 1997).

In view of the controlling Supreme Court jurisprudence, as well as our own conforming case law, we find that the practical or indirect financial effects of a judgment may enter a court's calculus, but rarely have significant bearing on a determination of an entity's status as an arm of the state. A state's legal liability (or lack thereof) for an entity's debts merits far greater weight, and is therefore the key factor in our assessment of the state-treasury prong of the *Fitchik* analysis.

In the case before us, the Board does not point to any evidence demonstrating that additional funds would, in fact, be provided by the state (as opposed to the Board finding it necessary to draw on the sources discussed *supra*, such as additional tax levies or sales of assets).[11] While we have little doubt that the state has an interest in seeing that Camden's schools remain operational, it would be improper to confer immunity based on our conjecture about the steps New Jersey might take following a judgment. The absence of any legal obligation on the part of New Jersey to provide funds in response to an adverse judgment against the Board is a compelling indicator that the state-treasury criterion—the first prong of the *Fitchik* test—weighs against immunity. Further, while the record shows that the Board receives very substantial

---

[11] In support of its position, the Board reminds us of Camden's weak tax base and of the large portion of total revenue provided by the state. Neither of these facts tells us how the state is likely, let alone obliged, to respond to a Board shortfall.

We note that state aid to the Camden school district is calculated using a statutory formula, and that a process for applying for supplemental aid is also provided by state statute. *See* Comprehensive Educational Improvement and Financing Act of 1996, N.J. Stat. Ann. § 18A:7F-1 et seq. No argument has been made, nor evidence presented, that applying for funds to cover or to reimburse a liability would qualify for supplemental aid. The state retains the option to reject supplemental requests. *See* N.J. Stat. Ann. § 18A:7F-6.

state funding, the Board possesses some alternative sources of revenue, and has not demonstrated that it would be incapable of satisfying a judgment against it, *see supra* Subsection II.C.1. Thus, we are not in accord with the District Court's view that the state-treasury criterion weighs in favor of finding the Board to be an arm of the state.

### D. The Totality of the Factors

The Board's legal status under state law supports the conclusion that it is not an arm of the state of New Jersey. The Board's somewhat constrained autonomy, on the other hand, slightly favors its classification as an arm of the state. Therefore, the state-treasury analysis is decisive in this case, and it counsels against the Board's immunity as an arm of the state. On balance, we hold that the Board has failed to show that it is entitled to Eleventh Amendment immunity. Accordingly, we find that the Board is subject to suit in federal court. The judgment of the District Court will therefore be reversed, and the case remanded for further proceedings.[12]

---

[12] Because we so conclude we need not reach the issue of whether Congress has abrogated the state's immunity under the self-care provision of the FMLA. In addition, in accordance with the appellants' stated position, we need not address the District Court's denial of appellants' request for leave to amend their complaint.