474 F.Supp.2d 720 (2007)
Allison COOPER, on behalf of herself and all others, similarly situated, c/o TRANSPORT WORKERS UNION LOCAL 234
v.
SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY
No. C.A. NO. 06-888.
United States District Court, E.D. Pennsylvania.
February 12, 2007.
*721 Hannah Schwarzschild, Patricia V. Pierce, Willig Williams and Davidson, Philadelphia, PA, Jordan M. Lewis, Siegel Brill Greupner Duffy & Foster, PA, Minneapolis, MN, for Allison Cooper, on behalf of herself and all others similarly situated, c/o Transport Workers Union Local 234.
Jo Bennett, Michael G. Tierce, Stevens & Lee PC, Thomas S. Biemer, Marianne E. Brown, Dilworth Paxson LLP, Philadelphia, PA, for Southeastern Pennsylvania Transportation Authority.

MEMORANDUM OPINION AND ORDER
GOLDEN, Judge.
The Plaintiff, a bus driver for the Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA"), brought this action, claiming that SEPTA violated the Fair Labor Standards Act, 29 U.S.C. § 207(a), by refusing to pay her for the time she spends performing mandated daily pre-trip inspections of her bus.[1] Presently before the Court is the motion of SEPTA to dismiss the FLSA claim on Eleventh Amendment grounds.[2] Because the Court has allowed Plaintiff to take limited discovery, including depositions, on the issue of the changes in SEPTA's funding since the Court of Appeals decided Bolden v. Southeastern Pennsylvania Trans.Auth., 953 F.2d 807 (3d Cir.1991) (en banc), cert. denied, 504 U.S. 943, 112 S.Ct. 2281, 119 L.Ed.2d 206 (1992), the Court will construe the motion as one for summary judgment under Fed.R.Civ.P. 56, See Fed.R.Civ.P. 12(b). For the reasons which follow, the motion is denied.
Summary judgment is appropriate if the moving party can "show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). When ruling on a motion for summary judgment, the Court must view the evidence in the light most favorable' to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the *722 non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of showing the absence of genuine issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has done so, the non-moving party must make a showing sufficient to establish the existence of every element essential to that party's case, based on the affidavits or by depositions and admissions on file. Anderson, 477 U.S. at 255, 106 S.Ct. 2505.
Because the motion for summary judgment deals solely with the status of SEPTA under the Eleventh Amendment, the Court will dispense with any recitation of the facts giving rise to Plaintiff's FLSA claim.
SEPTA argues generally that Plaintiffs claims against it under the FLSA are barred by the Eleventh Amendment because SEPTA is "arm of the state" entitled to sovereign immunity. The burden of proving Eleventh Amendment immunity is on the party asserting it, in this case, SEPTA. Christy v. Pennsylvania Turnpike Commission, 54 F.3d 1140, 1144 (3d Cir.1995).
It is well-settled, of course, that the Eleventh Amendment[3] immunizes an unconsenting state from suits brought in federal court by its own citizens as well as by citizens of another state. See e.g., Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); Seminole Tribe of Fla. v. Florida, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).
In addition, a suit may be barred by the Eleventh Amendment even though a state is not a named party to the action, so long as the state is deemed the real party in interest. Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997); Edelman v. Jordan, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir.1989).
In Fitchik, the Third Circuit held that in order to determine whether a suit against an entity is actually a suit against the state itself, a court must consider:(1) the source of the money that would pay the judgment (i.e., whether that source would be the state); (2) the status of the entity under state law; and (3) the degree of autonomy the entity has. Id. The Third Circuit emphasized that the most important factor was "whether any judgment would be paid from the state treasury." Id.
In 1991, the Third Circuit had occasion to consider whether SEPTA was a state entity by applying the Fitchik factors. Bolden, supra. With respect to the first factor, The Third Circuit found that the statistics relied on by SEPTA showed that only about 27% of its revenues came from the Commonwealth of Pennsylvania. Id. at 819. The Third Circuit also noted that SEPTA has "`no power . . . to pledge the credit or taxing power of the Commonwealth,'" its obligations may not "be deemed to be obligations of the Commonwealth,'" and the Commonwealth is not "`liable for the payment of principal or interest on such obligations.'" Id., quoting 1991 Pa. Laws 26, § 1503(21); 55 Pa. Stat.Ann. § 600.303(d)(20) (1991 Supp.). The Third Circuit also noted that SEPTA need not "`request funds from the state coffers in order to meet shortfalls caused by adverse judgments,'" id. quoting Fitchik, 873 F.2d at 661, but "`can raise revenues *723 by raising fares.'" Id. quoting Act 26 § 1503(9); 55 Pa.Sta.Ann. § 600.303(d)(9) (Purdon 1991 Supp.). Finally, the Third Circuit rejected SEPTA's argument that it might have to rely on additional state subsidies in the event raising fares proved insufficient, stating that voluntary payments by the state do not trigger the immunity of the Eleventh Amendment. Id., citing Fitchik, 873 F.2d at 661. As a result, the Third Circuit concluded that the first factor weighed "strongly" against SEPTA's claim of immunity.
With respect to the second factor, status under state law, the Third Circuit noted that SEPTA has a separate corporate existence, the power to sue and be sued, and the power to enter into contracts and make purchases on its own behalf. Bolden, 953 F.2d at 820. The Third Circuit stated that SEPTA also possesses certain attributes associated with sovereignty such as exemption from state property taxation and the power of eminent domain. Id. In addition, SEPTA, like the Commonwealth of Pennsylvania, is subject to the Pennsylvania Sovereign Immunity statute. Id. Finally, the Third Circuit noted that although SEPTA is proclaimed by statute to be "an agency and instrumentality" of the Commonwealth, the same provision described SEPTA as a "`separate body corporate and public.'" Id., quoting Pa.Stat. Ann. tit. 55, § 600.303(a) (Purdon 1991 Supp.); 26 Act § 1502. The Third Circuit concluded that the second factor weighs "slightly" in favor of Eleventh Amendment protection. Bolden, 953 F.2d at 820.
With regard to the third factor, autonomy, the Third Circuit noted that SEPTA's board of directors enjoy a wide range of autonomy, including the power to enter into contracts, bring lawsuits, purchase and sell property, buy insurance, set and collect fares. Id. SEPTA's actions are also not subject to gubernatorial veto. Id. Only five of the fifteen board members are appointed by state officials. Id. The remainder are appointed by the counties that SEPTA serves. Id. The Third Circuit concluded that the third factor was "weak[]" with regard to Eleventh Amendment immunity. Id.
The Court of Appeals decided that the totality of the three factors, with funding being the most important, weighed against finding that SEPTA was an arm of the state for purposes of the Eleventh Amendment. Id. at 821.
In an attempt to extricate itself from the Bolden precedent, SEPTA first argues that certain changes in the law regarding the Eleventh Amendment have occurred since Fitchik and Bolden were decided which have in effect rendered those decisions "outdated." SEPTA is mistaken.
The only change that has occurred in Third Circuit jurisprudence regarding Eleventh Amendment immunity since Fitchik and Bolden were decided is that the Third Circuit now accords equal consideration to all three Fitchik factors. Febres v. Camden Board of Education, 445 F.3d 227, 229 (3d Cir.2006); Benn v. First Judicial District, 426 F.3d 233, 239-40 (3d Cir.2005). It is only in close cases, "where indicators of immunity point in different directions" that the first factor should remain "our primary guide." Hess v. Port Authority Trans-Hudson Corp. 513 U.S. 30, 47, 48, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994). Indeed, just last year the Third Circuit employed the Fitchik factors in finding that the Camden County Board of Education was not an arm of the State of New Jersey. Febres, supra.
In the alternative, SEPTA argues that even applying the Fitchik factors, its financial condition has drastically changed since the Third Circuit decided Bolden and that the funding factor now weighs heavily in its favor. In support of its argument, SEPTA points out 1) its "structural operating *724 deficit" is projected to exceed 850 million in fiscal year 2007 and is projected to increase to $160 million in fiscal year 2008; 2) the state's share of SEPTA's budget now constitutes 52 percent of SEPTA's total budget for operating expenses and 3) the state provides more than $130 million in capital funding subsidies this year.[4]
With regard to the state treasury prong of the Fitchik analysis, the "key factor" is the "state's legal liability (or lack thereof) for an entity's debts." Febres, 445 F.3d at 236. "The absence of any legal obligation on the part of [a state] to provide funds in response to an adverse judgment against [the entity] is a compelling indicator" the state treasury prong of the Fitchik test weighs against immunity. Id.
Here, the Commonwealth of Pennsylvania has specifically disclaimed responsibility for SEPTA's liabilities:
[SEPTA] shall have no power, at any time or in any manner, to pledge the credit or taxing power of the Commonwealth or any other government agency, nor shall any of the authority's obligations be deemed to be obligations of the Commonwealth or of any other government agency, nor shall the Commonwealth or any other government agency be liable for the payment of principal or interest on such obligations.
74 Pa.C.S. § 1741(c).
Pursuant to the tenets of the Third Circuit in Febres, this absence of any legal obligation on the part of the Commonwealth of Pennsylvania to satisfy any adverse judgment against SEPTA is a "compelling indicator" that the funding prong of the Fitchik test weighs against immunity.
SEPTA nevertheless stresses that it receives a large amount of subsidies from the Commonwealth, indeed more than it received at the time Bolden was decided, and that these significant state subsidies make SEPTA an arm of the state. To support this contention, SEPTA has attached to its Motion to Dismiss as Exhibit A the affidavit of its Senior Director of Budgets, Richard G. Burnfield.
Burnfield avers, inter alia, that the Commonwealth of Pennsylvania is now the single largest source of funding for SEPTA, having provided in excess of $625.1 million in state subsidies in fiscal year 2006. Burnfield Affidavit at ¶ 28. According to Burnfield, SEPTA is currently projecting a structural operating deficit for the remaining six months of fiscal year 2007 exceeding $50 million and in 2008 to exceed $160 million. Id. at ¶¶ 10-11. Burnfield avers that "[t]he fare increases and service cuts necessary to meet SETA's budget shortfall would so reduce the level of service and ridership as to create a public crisis in the region." Id. at ¶ 12.
Attached to Burnfield's Affidavit as Exhibit A is a chart displaying the history, of SEPTA's operating, subsidy funding. For Fiscal Year 2006, the chart shows that 35% of SEPTA's total budget for operating expenses came from state subsidies as opposed to 31.7% in 1991, the year Bolden was decided. Exhibit B shows that the percent for Fiscal Year 2006 swells to 44.7% when the total operating budget includes $92.1 million in Federal Highway Funds the Commonwealth elected to transfer as operating funding to SEPTA. Indeed, in his affidavit, Burnfield claims the total is actually 52%. Burnfield Affidavit at ¶ 25.[5]
*725 SEPTA admits, however, that it can also close its operating deficit by fare raises, service reductions and employee layoffs. Lewis Affidavit, Exhibit 3, p. 18, 1.22-p. 19 1.7. In addition, according to Exhibit B to the Burnfield Affidavit, for fiscal year 2006, SEPTA received $75,367.00 in local subsidies and $31,200.00 in federal subsidies (the amount increases to $123,300.00 when the $92.1 million in Federal Highway funds are construed as federal, rather than state, subsidies).
There is no doubt that SEPTA receives substantial state funding, whether it be 35%, 44.7% or 52%. Indeed, in Febres, the Third Circuit found that the fact that 85% to 90% of the Board of Education's money came from the state of New Jersey was not enough to trip the state treasury factor in favor of sovereign immunity. SEPTA has not shown, however, that it would be incapable of satisfying a judgment against it and has in fact admitted it can raise additional revenue by fare raises, service reductions and employee layoffs. While the Commonwealth of Pennsylvania might ultimately have to provide funds in response to an adverse judgment against SEPTA in this litigation, the key fact is *726 that it would not be legally obligated to do so. Febres, 445 F.3d at 236. "[V]oluntary payments by a state do not trigger Eleventh Amendment immunity.'" Id. at 234, quoting Christy, 54 F.3d at 1147. Thus, the Court finds that the state treasury factor weighs against finding that SEPTA is an arm of the state.[6]
Turning to the second factor, SEPTA's legal status under state law, the Third Circuit in Febres stated that four sub-factors are relevant in the analysis: how SEPTA is treated under state law in general, whether SEPTA can sue or be sued in its own right, whether SEPTA is separately incorporated, and whether it is immune from state taxation. Febres 445 F.3d at 230.
The Commonwealth of Pennsylvania has determined that SEPTA "shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof." 74 Pa.Cons. Stat. § 1711(a).[7] SEPTA is separately incorporated and the incorporating statute specifically provides that SEPTA can "sue and be sued." 74 Pa.Cons.Stat. § 1741(a)(2). In addition, since Bolden was decided, the Supreme Court of Pennsylvania has held that SEPTA is not immune for all purposes from state taxation. SEPTA v. Board of Revision of Taxes, 574 Pa. 707, 720, 833 A.2d 710, 717 (Pa. 2003).(In its role as a commercial landlord, SEPTA is obligated to pay real estate tax). Given that the Commonwealth treats SEPTA as an agency of the Commonwealth, the Court finds the four sub-factors weigh slightly in favor of Eleventh Amendment protection.
With regard to the third factor, degree of autonomy, the Court notes that nothing about SEPTA's autonomy has changed since the Third Circuit's decision in Bolden. The Commonwealth still appoints only five of SEPTA's 15 board of directors. 74 Pa.Cons.Sta. § 1713(a)(1)-(3). SETA's agenda is still controlled by its board of directors. Lewis Affidavit, Exhibit 5 at Exhibit B. SEPTA's decisions are still not subject to gubernatorial veto. The Court *727 finds that the third factor weighs against Eleventh Amendment immunity.
In sum, the Fitchik and Bolden decisions remain the law of this Circuit and this Court is bound to follow them. See, Febres, supra. Applying the three-factor test of Fitchik, the Court finds that very little has changed regarding SEPTA's status since the Third Circuit decided Bolden. The state treasury and autonomy factors counsel against Eleventh Amendment immunity for SEPTA while the legal status factor counsels slightly in favor of Eleventh Amendment immunity. As a result, the Court finds that SEPTA has failed to show that it is an arm of the state and therefore subject to immunity under the Eleventh Amendment. Accordingly, SETA's motion for summary judgment is denied.

ORDER
AND NOW, this day of February, 2007, upon consideration of the Defendant's Motion to Dismiss based on the Eleventh Amendment and all responses and replies thereto, it is hereby ORDERED that:
The motion of the Defendant to dismiss [Doc. # 3] is treated as a motion for summary judgment under Fed.R.Civ.P. 56.
The motion of the Defendant for summary judgment [Doc # 3] is DENIED.
Pursuant to the consent of Plaintiff, all Plaintiff's state law claims are DISMISSED WITH PREJUDICE.
The Defendant shall file an Answer to the remaining FLSA count in the Complaint within 20 days of the date of this Memorandum Opinion and Order.
NOTES
[1] This case was originally assigned to the Honorable Stewart Dalzell, then reassigned to the calendar of the undersigned on August 10, 2006.
[2] Plaintiff also asserted several claims against SEPTA under state law, but concedes in her response brief that these claims are without merit. Memorandum in Opposition to Defendant's Motion to Dismiss at p. 20. The accompanying Order disposes of those claims.
[3] The. Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."
[4] Septa's Motion to Dismiss Complaint a 14-20.
[5] Plaintiff takes issue with many of SEPTA's statistics. For example, Plaintiff points out that in SEPTA's 2006 budget, flexible funds are defined as:

Flexible Funds-Federal funds made available by [The Transportation Equity Act for the 21st Century, signed into law by President Clinton in 1998] that can be used for various transportation projects, including both highway and mass transit projects. Allocation of these funds is at the discretion of regional Metropolitan Planning Organizations (MPOs) and state governments.
Exhibit 5 to Affidavit of Jordan M. Lewis, Esq. at 206. (Emphasis added). Plaintiff contends that the allocation of flexible funds is subject to approval by the Delaware Valley Regional Planning Commission, which is an "interstate, intercounty and intercity agency", not an arm of the Commonwealth of Pennsylvania. Exhibit 4 to Lewis Affidavit. Thus, claims Plaintiff, Burnfield's averment that flexible highway funds are part of the state subsidy is inconsistent with SEPTA's 2006 budget, where the funds are classified as federal subsidies.
Plaintiff also points out that in its Exhibit B to the Burnfield Affidavit, SEPTA has moved its "senior subsidy" of 52.3 million and its "shared ride subsidy" of $17.3 million from its own revenue totals and now counts them as part of its state subsidy. Plaintiff's Supplemental Memorandum at 11. In his affidavit Burnfield, avers: "The senior subsidy and shared ride subsidy come from state funds generated by the Pennsylvania lottery. If the lottery funds are insufficient to meet SEPTA's subsidy needs, state law provides that the subsidy is to come from the state's general revenue fund." Burnfield Affidavit at ¶ 21.
Plaintiff contends that a review SEPTA's own 2006 budget yields a contrary result. The 2006 budget states:
SEPTA's enabling legislation requires that no less than half of SEPTA's budget be funded through operating revenue. For this purpose, the Commonwealth has defined operating, revenue to include Passenger Revenue, Senior Citizen free transportation, the Shared Ride program, Investment Income, Other Income, Asset Maintenance and Route Guarantees. Also for this purpose, the Commonwealth excludes Depreciation from operating expenses. For Fiscal Year 2006, SEPTA's operating ratio (operating revenue divided by operating expense) is 51.2%.
Exhibit A to Lewis Affidavit at 23 (emphasis added). Thus, SEPTA's own budget classifies senior ride and shared ride subsidies as operating revenue. Plaintiff points out that nowhere in his affidavit does Burnfield explain why he classifies senior ride and shared ride programs as state subsidies and SEPTA's own budget specifically classifies them as operating revenue.
As noted by Plaintiff, Burnfield's classification reduces [SEPTA's] operating ratio (revenue divided by expense) to less than the mandated 50 percent. More specifically, SEPTA's 2006 total budget includes $477.3 million in revenues (which includes senior ride and shared ride subsidies) and $474.5 million in subsidies. By reallocating these funds, which total $70 million, as state subsidies, Burnfield has reapportioned contributions so that subsidies now account for 57.20% of SEPTA's 2006 budget.
Plaintiff's Supplemental Memorandum at 11-12.
[6] SEPTA directs our attention to two cases involving transit operations wherein the respective Court of Appeals found that each was an arm of the State. See Morris v. Wash. Metro. Area Transit Auth., 781 F.2d 218 (D.C.Cir.1986) and Alaska Cargo Transp., Inc. v. Alaska R.R.Corp., 5 F.3d 378 (9th Cir.1993). In Febres, the Third Circuit distinguished both cases from the situation before it as follows:

In Morris, immunity was accorded to an interstate transit system. Analysis of both the entity's status under state law and its limited autonomy suggested it was an arm of the two states the transit system served. (Citation omitted). While the states involved were not directly liable, Congressional funding for the system was made contingent upon the states' agreement to meet the system's operating deficits, which could include adverse judgments. And, from the beginning, it was fully anticipated that the entity would have large deficits and thus be continually dependent on the states for its financial survival. (Citation omitted). Alaska Cargo Transport held that the railroad at issue was entitled to immunity as an alter ego of the state, even though the state had expressed liability for it by statute. The case turned on the critical function performed by the railroad in Alaska, and federal laws which essentially required the state to keep the railroad afloat. (Citation omitted).
Since none of the distinguishing facts of Morris (which the Third Circuit in Bolden had the option of following) and Alaska Cargo are present here, this Court, like the Third Circuit in Febres, elects not to follow either decision.
[7] Citing the Third Circuit's decision in Benn, SEPTA argues that once the Court finds that state law treats SEPTA as an agency of the Commonwealth, our analysis need proceed no further. This Court's reading of Benn simply does not support SEPTA's proposition.